**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VINODH PARSAD MAHARAJ; SUNITA
DEVI MAHARAJ; PREETIKA MAHARAJ;
MEENAL MAHARAJ; VINEET
MAHARAJ,
                    *Petitioners,*

            v.

ALBERTO R. GONZALES, Attorney
General,
                    *Respondent.*

No. 03-71066

Agency Nos.
A71-788-923
A71-788-924
A72-402-323
A72-402-324
A72-402-325

VINODH PARSAD MAHARAJ; SUNITA
DEVI MAHARAJ; PREETIKA MAHARAJ;
MEENAL MAHARAJ; VINEET
MAHARAJ,
                    *Petitioners,*

            v.

ALBERTO R. GONZALES, Attorney
General,
                    *Respondent.*

No. 03-73995

Agency Nos.
A71-788-923
A71-788-924
A72-402-323
A72-402-324
A72-402-325

OPINION

On Petitions for Review of Orders of the
Board of Immigration Appeals

Argued and Submitted En Banc March 23, 2006
San Francisco, California

Filed June 9, 2006

6389

Before: Mary M. Schroeder, Chief Judge, Harry Pregerson,
Diarmuid F. O'Scannlain, Pamela Ann Rymer,
Andrew J. Kleinfeld, Sidney R. Thomas, Susan P. Graber,
William A. Fletcher, Raymond C. Fisher, Ronald M. Gould,
Richard A. Paez, Johnnie B. Rawlinson, Richard R. Clifton,
Jay S. Bybee, and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Rymer;
Parial Concurrence and Partial Dissent by
Judge O'Scannlain

**COUNSEL**

Robert B. Jobe (argued), San Francisco, California, and Ashwani K. Bhakhri (signed the briefs), Burlingame, California, for the petitioners.

Alison Marie Igoe (argued), and Nancy E. Friedman (signed the briefs), United States Department of Justice, Washington, D.C., for the respondent.

---

**OPINION**

RYMER, Circuit Judge:

Vinodh Parsad Maharaj and his family, natives and citizens of Fiji, petition for review of a Board of Immigration Appeals (BIA) decision that denied them asylum on the ground that they were firmly resettled in Canada after fleeing persecution in Fiji and before arriving in the United States. Under regulations applicable to Maharaj's application, the Attorney General is precluded from granting asylum to an alien who was "firmly resettled" in another country prior to arrival in this country. 8 C.F.R. § 208.13(c)(2)(i)(B) (2000). An alien is considered firmly resettled if he "entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement" unless he shows that entry into that country was a necessary part of flight from persecution, that he stayed there only long enough to arrange onward travel, and that he did not establish significant ties in that country; or that the conditions of his residence in that country were so restricted that he was not in fact resettled. 8 C.F.R. § 208.15 (2000).

The Maharajes lived in Canada for four years after leaving Fiji. They worked in Canada and had a child there. Their older children were afforded a free public education, and the entire family had health benefits. The Maharajes applied there for refugee status or asylum but left before their application was acted upon because they believed the grass was greener on the other side of the border. Given their safe, four-year residence in Canada, where they were able to work and receive benefits, and their pending application for refugee status, the

Immigration Judge (IJ) applied a rebuttable presumption of firm resettlement based upon our opinion in *Cheo v. INS*, 162 F.3d 1227 (9th Cir. 1998). As Maharaj provided no evidence in rebuttal, the IJ found that he was statutorily ineligible for asylum. The BIA affirmed.

A panel of this court denied Maharaj's petition for review. *Maharaj v. Gonzales*, 416 F.3d 1088 (9th Cir. 2005). We are rehearing this petition en banc in order to consider afresh what evidence the Department of Homeland Security (DHS)[1] must produce in order to meet its initial burden of showing that the mandatory bar applies, such that the burden shifts to the alien to show that he was not firmly resettled. This is not an easy task, because the circuit courts of appeals are not of one mind and construing the regulation in accordance with its plain language is not entirely satisfying. Nevertheless, § 208.15 reflects the agency's interpretation of firm resettlement, and it plainly requires DHS to make a threshold showing that the alien had an offer of some type of official status permitting him to reside in the third country indefinitely. As have others, we conclude that this showing can be made by direct evidence of an offer issued by the third country's government or, where no direct evidence of a formal government offer is obtainable, by circumstantial evidence of sufficient force to indicate that the third country officially sanctions the alien's indefinite presence. Once DHS has adduced some evidence of official recognition of the alien's right to stay in the third country, the burden shifts to the alien to show that he falls within one of the regulatory exceptions, § 208.15(a) or (b). At this stage, the IJ is to consider the conditions under which other residents of the third country live, and how the

---

[1]The Immigration and Naturalization Service (INS) has been abolished and its functions transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2142 (2002), 6 U.S.C. §§ 101-557. Although the INS was the agency that sought to deport the Maharajes, we will generally refer to the government as DHS.

applicant was treated by comparison. 8 C.F.R. § 208.15(b). So holding, we align ourselves with Judge Becker's leading opinion for the Court of Appeals for the Third Circuit in *Abdille v. Ashcroft*, 242 F.3d 477 (3d Cir. 2001), and with the substantially similar approach embraced by the First, Seventh, Eighth and Tenth Circuits.

In this case, the IJ lacked sufficient evidence that the mandatory resettlement bar applies to shift the burden to Maharaj. DHS may be able to show that under Canadian law the type of work permit that Maharaj had, or the progress of his application for refugee status, or the benefits he received, manifested some type of entitlement to stay indefinitely. However, the record is undeveloped on these points. As such matters are for the immigration judge to determine in the first instance, we remand for a new look on a new record.

If the mandatory bar does not apply, then the issue arises whether country conditions in Fiji have changed such that Maharaj can no longer have a well-founded fear of future persecution if returned. Because the BIA did not make an individualized determination about the effect of changed country conditions following the May 2000 coup that occurred in Fiji, we remand for this purpose as well.

I

Vinodh Maharaj, his wife Sunita Maharaj, and two of their three children are citizens of Fiji, where they lived until November 1987. They are of Indo-Fijian ethnicity. Maharaj worked as a bus driver and his wife, as a secretary for a high school. He was instructed by his boss in March 1987 to aid the Coalition Labor Party (CLP) by transporting Indo-Fijian voters to polling stations for the national elections. The bus Maharaj drove was visibly partisan on behalf of CLP, displaying CLP placards, posters, and flags. After the election, which the CLP won, Maharaj received several threats from native Fijians, including a threat to kill him and his family and to

burn down their residence. Maharaj believes that the native Fijians blamed the CLP victory in part on his busing supporters to the polls.

Two months later, the Fijian army, which is composed almost exclusively of native Fijians, overthrew the CLP government. Immediately after the coup, two soldiers invaded the Maharajes' rented room, stole various items, tied Maharaj up, and forced his wife at gunpoint to conduct traffic in her underwear. About a week later, Sunita Maharaj was stopped on her way to work by two soldiers who dragged her into an nearby house and raped her at gunpoint, breaking her arm and burning her with cigarettes. She was turned away from the police station and the hospital by ethnic Fijian soldiers.

In June or July, Maharaj was attacked by native Fijian soldiers while driving his bus route. They demanded money and, when Maharaj refused, they broke two of his ribs, knocked him unconscious, bruised his jaw, and left him with cuts on his face. Maharaj was treated by a nurse at the hospital but, he was turned away from the police station when he tried to report the incident because he was Indo-Fijian. The following month, the Maharaj family's rented room was burned down; although there were no witnesses, Maharaj believes that the culprits were native Fijians.

No further attacks occurred between August 1987 and the family's departure from Fiji; however, Maharaj received some threats and his practice of Hinduism was restricted. In November 1987, the family left Fiji for Canada, where Maharaj's sister lived. The Maharaj family settled in Edmonton and applied for asylum or refugee status.

The Maharajes lived in Canada for four years. They received work authorizations and health insurance from the Canadian government, rented an apartment, and sent their children to free public school. Maharaj testified that the Canadian government never asked him to leave and that he was

safe, but he "didn't have any status" and so was not settled in Canada. Maharaj worked as a full-time janitor and also as a bakery deliveryman, and his wife received training to become a nurse's assistant and worked full-time for one year caring for the elderly. Both complained about working menial jobs and about the stigma associated with being refugees. When asked at the hearing how people knew they were refugees, Sunita Maharaj replied that they "had different social security number[s]." However, when asked whether they were given actual social security numbers, she clarified that she was referring to their work permits and that people "kn[ew] by that work permit that we are refugees somehow." Maharaj testified that he had work authorization while his refugee case was going on. Both also felt that people in Canada didn't like them very much because they didn't get good work and were seen as "a very low class people."

The Maharajes entered the United States as visitors in March 1991 in a car driven by a Canadian citizen. Apparently the two Canadian citizens in the front seat were asked for identification, but the Maharajes were not. Maharaj testified that he "wanted to move to United States because, uh, [he] wanted to see what United States looks like" and explained that once they arrived, they "liked this place much better than Canada, so [they] decided to stay." Sunita Maharaj testified that the family decided to leave Canada because "we were not getting good job . . . . We wanted to, you know, go up and have more money and build ourself. So, that's the time when we thought we don't like Canada."

When they overstayed the six months permitted for visitors, Maharaj and his family were served with Orders to Show Cause on September 19, 1996, charging them with being deportable pursuant to section 241(a)(1)(B) of the Immigration and Nationality Act. Maharaj (and his family derivatively) conceded deportability but requested asylum and withholding of removal.

Following a hearing at which Maharaj and his wife testified, the IJ found that the Canadian government has a reputable refugee program, very similar to that of the United States, but the Maharajes elected to come to the United States before Canadian authorities had an opportunity to review the case. So, the IJ found, "they never were actually granted refugee status, but it clearly was offered them. They just chose not to take advantage of it, or not wait until it was offered them, or until there was a final resolution of the problem." Ultimately, he concluded that the *Cheo* presumption of firm resettlement applied because the Maharajes had spent a significant amount of time in Canada, which is a safe country, and were "attempting to accept an offer of refugee status, but elected not to wait for the outcome of that offer, which included over a space of four years, the right to live, and work, and most of all benefits under Canadian law."

As the INS conceded past persecution, withholding of deportation was the only remaining issue. The IJ considered the State Department's 1996 Profile of Asylum Claims and Country Conditions for Fiji, and determined that there was little or no possibility that the Maharajes would again suffer persecution given changes that had occurred since the 1987 coup. The IJ also relied upon the fact that the Maharajes had requested renewal of their Fijian passports, which indicated that they did not seriously fear returning. The IJ designated Fiji as the country of removal for all members of the family except the youngest child, who is a Canadian citizen and whose country of removal was designated as Canada.

Maharaj appealed to the BIA but, before his appeal was heard, filed a motion to reopen based on new evidence of changed conditions in Fiji arising out of a 2000 coup, and a one-page fax purportedly showing that his application for asylum in Canada had been denied. On February 27, 2003, the BIA affirmed the IJ's decision that the Maharaj family was firmly resettled in Canada. In doing so, it cited *Matter of Burbano*, 20 I. & N. Dec. 872, 874 (BIA 1994), which indicates

that the Board adopted the immigration judge's decision. *Tchoukhrova v. Gonzales*, 404 F.3d 1181, 1188 (9th Cir. 2005) (explaining that "[w]hen the BIA does not express any disagreement with any part of the immigration judge's decision, but instead cites *Burbano*, the BIA adopts his decision in its entirety"). In the alternative, the BIA found that Maharaj's claim failed because the presumption of a well-founded fear of persecution had been rebutted by evidence of changed circumstances in Fiji. The BIA interpreted Maharaj's motion to reopen as a motion to supplement the record, which it denied because the fax cover sheet was both unauthenticated and not convincing.

Maharaj again petitioned the BIA to reopen his case based on the coup that occurred in Fiji in May 2000. The BIA denied Maharaj's motion to reopen on October 8, 2003, noting that evidence of the May 2000 coup "was before the Board when we issued our prior decision." Further, the BIA held that because Maharaj was ineligible for asylum on firm resettlement grounds, the evidence of changed country conditions was only relevant to Maharaj's withholding of deportation and Convention Against Torture (CAT) claims. The BIA concluded that the evidence was not sufficient to establish a prima facie case of eligibility for withholding of deportation or CAT relief and therefore reopening was not warranted.

Maharaj timely appeals the BIA decision affirming the IJ's denial of asylum and withholding of deportation. Maharaj did not challenge the BIA's denial of his motion to reopen in his opening brief and thus has waived appeal on that issue. *See Martinez-Serrano v. INS*, 94 F.3d 1256, 1259-60 (9th Cir. 1996) (holding that a petitioner's failure to address the BIA's denial of a motion to reopen in the argument portion of his opening brief on appeal waived the issue).

II

A finding of "firm resettlement" is a factual determination that we review under the deferential substantial evidence stan-

dard. *See Nahrvani v. Gonzales*, 399 F.3d 1148, 1151-52 (9th Cir. 2005) (applying substantial evidence standard to firm resettlement determination). Other circuits agree. *See Sall v. Gonzales*, 437 F.3d 229, 232 (2d Cir. 2006) (per curiam); *Firmansjah v. Gonzales*, 424 F.3d 598, 601 (7th Cir. 2005) (citing *Diallo v. Ashcroft*, 381 F.3d 687, 695 (7th Cir. 2004)); *Salazar v. Ashcroft*, 359 F.3d 45, 50 (1st Cir. 2004); *Rife v. Ashcroft*, 374 F.3d 606, 611-12 (8th Cir. 2004); *Elzour v. Ashcroft*, 378 F.3d 1143, 1150-51 & n.9 (10th Cir. 2004); *Abdille*, 242 F.3d at 483 (3d Cir. 2001); *Mussie v. INS*, 172 F.3d 329, 331 (4th Cir. 1999). Under this standard, the BIA's finding of firm resettlement "must be upheld if supported by reasonable, substantial, and probative evidence on the record considered as a whole," and we will reverse only if a reasonable fact-finder would have been compelled to reach a different conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 & n.1 (1992) (internal quotation marks omitted); *see also Kotasz v. INS*, 31 F.3d 847, 851 (9th Cir. 1994).

## III

**[1]** The Attorney General has discretion to grant asylum to an alien who is a "refugee." 8 U.S.C. § 1158(b)(1). A "refugee" is an alien who is unable or unwilling to return to his country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). However, as of October 1, 1990, INS regulations prohibit an immigration judge or asylum officer from granting asylum to an alien who "[h]as been firmly resettled" in a third country prior to arriving in the United States. 8 C.F.R. § 208.13(c)(2)(i)(B).[2] "Firm resettlement" is

---

[2]Because Maharaj filed his application for asylum on May 3, 1991, before the effective date of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996), we review his case under the firm resettlement provisions set out in 8 C.F.R. § 208.13(c)(2)(i)(B) and defined in 8 C.F.R. § 208.15. *See* 8

defined for purposes of the mandatory bar in 8 C.F.R. § 208.15. Section 208.15 provides:

> An alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement unless he or she establishes:
>
> (a) That his or her entry into that country was a necessary consequence of his or her flight from persecution, that he or she remained in that country only as long as was necessary to arrange onward travel, and that he or she did not establish significant ties in that country; or
>
> (b) That the conditions of his or her residence in that country were so substantially and consciously restricted by the authority of the country of refuge that he or she was not in fact resettled. In making his or her determination, the asylum officer or immigration judge shall consider the conditions under which other residents of the country live; the type of housing, whether permanent or temporary, made available to the refugee; the types and extent of employment available to the refugee; and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation that includes a right of entry or reentry, education, public relief, or natural-

---

C.F.R. § 208.13(c)(2)(i)(B) ("An immigration judge or asylum officer shall not grant asylum to any applicant who filed his or her application before April 1, 1997, if the alien . . . [h]as been firmly resettled within the meaning of § 208.15."). The firm resettlement bar was codified at 8 U.S.C. § 1158(b)(2)(A)(vi) in 1996, but the regulation's definition of firm resettlement remained the same.

ization, ordinarily available to others resident in the country.

8 C.F.R. § 208.15.[3]

Rather than recite the history of the resettlement doctrine here, we rely on Judge Becker's opinion in *Abdille*, which comprehensively examines it. 242 F.3d at 483 & n.4. The bottom line is that until October 1990, when §§ 208.13(c)(2)(i)(B) and 208.15 created the rule of mandatory denial for a firmly resettled alien seeking asylum and defined "firm resettlement," an alien's resettlement elsewhere was only *a* factor to be considered by immigration judges, the BIA, and the courts in evaluating an asylum claim as a matter of discretion. *See Rosenberg v. Yee Chien Woo*, 402 U.S. 49 (1971) (holding that despite a statutory change from "firm resettlement" to "flight" from persecution in the Refugee Relief Acts of 1957, 1960, and 1965, firm resettlement was not irrelevant but was one of the factors to be taken into account in determining whether a refugee seeks asylum as a consequence of his flight to avoid persecution); *Matter of Soleimani*, 20 I. & N. Dec. 99, 104 (BIA 1989) (holding that regulations requiring denial of admission to a firmly resettled refugee were only binding on INS directors, not immigration judges or the Board itself, such that resettlement in a third country was a factor to be considered in evaluating an asylum claim as a matter of discretion), *superseded by regulation as stated in Abdille*, 242 F.3d at 483 n.4.

When firm resettlement was only one factor informing a discretionary calculus, "an adjudicator could consider factors such as the length of stay, ability to work, familial ties, economic conditions in the third country, and the like" in favor of, or against, a grant of asylum. *Diallo*, 381 F.3d at 693. The

---

[3]Whether or not an asylum claim *must* be denied, it *may be* in the discretion of the Secretary of Homeland Security or the Attorney General. *See* 8 U.S.C. § 1158(b)(1). Only the mandatory bar is at issue in this case.

cases most frequently cited for doing so are *Chinese American Civic Council v. Attorney General*, 566 F.2d 321 (D.C. Cir. 1977), and *Farbakhsh v. INS*, 20 F.3d 877, 881 n.2 (8th Cir. 1994) (noting that the mandatory bar did not apply to Farbakhsh's application for asylum, which was filed before October 1, 1990).[4] However, as one commentator has observed, the 1990 regulations "deemphasiz[ed] the previously paramount question whether the refugee remains in flight," and "reoriented the central inquiry of firm resettlement to focus the adjudicator on the actual existence vel non of an offer of permanent resettlement." Robert D. Sloane, *An Offer of Firm Resettlement*, 36 GEO. WASH. INT'L L. REV. 47, 57 (2004). Since then, most, but not all, circuits have oriented the focus accordingly.

---

[4]In *Chinese American Civic Council*, Chinese aliens had fled mainland China and spent between sixteen and twenty years in Hong Kong before applying for refugee status in the United States. Following *Woo*, the court found that the aliens' extended residence in Hong Kong led to the "normal conclusion" that "they were 'firmly resettled,' *i.e.*, not still in flight." 566 F.2d at 326, 328. It indicated that factors other than duration of residence may be relevant to the firm resettlement inquiry, including "[a]n applicant's family ties, intent, business or property connections and other matters," but that those factors were insufficient to rebut the finding that these particular aliens were firmly resettled. *Id.* at 328 n.18. The court was also influenced by governmental assurance of continued residence for, as the court explained, under the Hong Kong Ordinance of 1971 aliens who lived there at least seven years, whether legally or not, had reasonable assurance they would not be deported and hence were firmly resettled. *Id.* at 328 & n.17.

*Farbakhsh* involved an Iranian citizen who fled to Spain. Guided by *Matter of Soleimani*, the court held that evidence supported the Board's finding that Farbakhsh was firmly resettled in Spain because he had resided there for more than four years without fear of being returned to Iran; he initially intended to remain in Spain because he filed an application for refugee status there; his application for refugee status was pending; his younger brother and younger sister were living in Spain; his arrival in the United States was not reasonably proximate to his flight from persecution in Iran; and his stay in Spain was not a stopover en route to refuge in the United States. 20 F.3d at 882.

A

**[2]** We have addressed the mandatory bar several times, and have held that there must be evidence of an offer of permanent, not temporary, residence in a third country where the applicant lived peacefully and without restriction. *Ali v. Ashcroft*, 394 F.3d 780 (9th Cir. 2005); *Camposeco-Montejo v. Ashcroft*, 384 F.3d 814 (9th Cir. 2004). The fact that an alien no longer has travel authorization does not preclude a finding of permanent resettlement when the applicant has permitted his documentation to lapse. *Vang v. INS*, 146 F.3d 1114 (9th Cir. 1998); *Yang v. INS*, 79 F.3d 932 (9th Cir. 1996). And in the absence of direct evidence of an offer of some type of permanent resettlement, a lengthy and undisturbed residence in the third country may establish a rebuttable presumption that he has the right to return and remain there indefinitely, thus shifting the burden to the applicant to show otherwise. *Cheo*, 162 F.3d at 1229; *see also Andriasian v. INS*, 180 F.3d 1033 (9th Cir. 1999).

*Cheo* is the seminal opinion upon which the IJ's decision pivoted in this case. In *Cheo*, Cambodian nationals lived in Malaysia without molestation or persecution for three years prior to being smuggled into this country. "[T]here [was] no direct evidence one way or the other as to whether the Cheos have or had the right to return to Malaysia," 162 F.3d at 1229, but the IJ presumed a right to return from their three-year undisturbed stay. We concluded this was permissible, reasoning that the regulations then in place provided that if a ground for denial of asylum, such as firm resettlement, "may apply," the applicant has the burden of proving by a preponderance of evidence that the ground does not apply.[5] Three years of

---

[5]8 C.F.R. § 208.14(c) (1997), the applicable regulation at the time *Cheo* was decided, provided:

If the evidence indicates that [one of the enumerated grounds for denial of asylum, including firm resettlement] *may apply*, the

peaceful residence established that the ground of firm resettlement in Malaysia "might apply" because it was enough to infer that Malaysia allowed the Cheos to stay indefinitely. Thus, we held that "[a] duration of residence in a third country sufficient to support an inference of permanent resettlement in the absence of evidence to the contrary shifts the burden of proving absence of firm resettlement to the applicant." *Id.*[6]

We have explicated *Cheo* on several occasions. *Andriasian* involved ethnic Armenian natives of Azerbajian who escaped to Armenia and lived in that country off and on for several years before arriving in the United States. Andriasian and his family were mocked in Armenia, someone attempted to rape his wife, the family was harassed on account of their religion, and at least one death threat was made. The BIA had exercised its discretion to deny asylum on the ground of firm resettlement,[7] even though it had determined that the mandatory bar

---

applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.

*Id.* (emphasis added). The regulation has since been changed to provide:

If the evidence indicates that [one of the enumerated grounds for denial of asylum, including firm resettlement] *apply* to the applicant, he or she shall have the burden of proving by a preponderance of the evidence that he or she did not so act.

8 C.F.R. § 208.13(c)(2)(ii) (2000) (emphasis added).

[6]We observed that this was consistent with the views of the two other circuits to consider the question. *Chinese American Civic Council* was one of the two; the other was *Abdalla v. INS*, 43 F.3d 1397 (10th Cir. 1994), in which the petitioner had lived for twenty years in the United Arab Emirates after fleeing Sudan. He possessed a "residence" visa/permit. The court found this sufficient to suggest "permanent residence status, citizenship or some other permanent resettlement," and accordingly shifted the onus to Abdalla to prove that his "extended, officially sanctioned" stay in Abu Dhabi did not constitute a firm resettlement. *Id.* at 1399 (citing *Chinese Am. Civic Council*, 566 F.2d at 326) (internal quotation marks omitted).

[7]The regulations in effect when *Andriasian* was decided provided:

An asylum application may be denied in the discretion of the

did not apply. We held that the presumption shifting the burden to the applicant was inapplicable because unlike *Cheo*, the duration and circumstances of Andriasian's stay in Armenia did not indicate that he was offered a permanent refuge. We also noted that when Andriasian asked the government about temporary resident status, he was told to go back to Karabakh, and that the INS conceded on appeal that he was not firmly resettled.

In *Camposeco-Montejo*, a citizen of Guatemala fled with his parents to Mexico in 1982 where he lived in refugee camps, was not allowed to attend Mexican schools, and could not leave the municipality in which the camp was located until 1996 when he was given an "FM3" card which permitted travel outside the municipality and the right to work. An FM3 did not confer the right to apply for permanent residency. We concluded that the IJ's finding of firm resettlement on account of sixteen years of residence in Mexico was not supported by substantial evidence as Camposeco did not experience the freedom and lack of persecution that characterized the applicants' stays in *Cheo* and *Vang*, and his stay was not "undisturbed" because he was restricted to a single municipality, could not attend Mexican schools, and was threatened with repatriation to Guatemala.

Most recently in *Ali*, we considered whether natives of Somalia who lived in Ethiopia for five years were firmly resettled in Ethiopia. The Ethiopian government never offered assistance or legal status, and the Alis couldn't work (except

---

Attorney General if the alien can be removed to a third country which has offered resettlement and in which the alien would not face harm or persecution.

8 C.F.R. § 208.13(d) (1999). This provision was removed effective January 5, 2001. *See* Asylum Procedures, 65 Fed. Reg. 76,121, 76,126 (Dec. 6, 2000) (explaining that § 208.13(d) was being removed "from the regulations to avoid confusion").

under the table) or go to school. We held that "the plain lan-
guage and structure of [§ 208.15] require that an asylum
applicant be offered permanent resident status or its equiva-
lent by the country of first asylum to be considered firmly
resettled." *Ali*, 394 F.3d at 789-90 (citing *Abdille*, 242 F.3d at
485). We also held that the IJ incorrectly interpreted *Cheo* as
standing for the proposition that "where an individual resides
for a number of years in a third country without being both-
ered it is appropriate to presume firm resettlement." *Id*. at 790
(internal quotation marks omitted). Rather, we explained,
*Cheo* turned on the absence of evidence to the contrary and,
as Ali testified that she never received an offer of permanent
residence in Ethiopia, the presumption did not arise. In addi-
tion, we emphasized that because the plain language of the
regulation requires an offer of permanent residence, an offer
of temporary residence does not compel a finding of firm
resettlement.

B

The IJ in this case understood a rebuttable presumption to
arise under *Cheo* "where an alien has spent a significant
amount of time in another safe country before arriving in the
United States, but the Court has no information on his status
there." Maharaj submits that *Cheo* has no application to his
case because its presumption is premised on the absence of
evidence one way or the other, whereas the evidence here is
uncontested that he had no offer of permanent resettlement.
The government counters that most courts accept some form
of *Cheo* analysis, and that Maharaj's approach would read all
but a few countries out of the definition.

We are not entirely persuaded by either position. On the
one hand, to presume resettlement in the absence of "informa-
tion" begs the question of who has the burden of adducing
evidence and what showing suffices to shift the burden to the
applicant under the regulations. Also, there *is* information
about Maharaj's status as the evidence shows that he had per-

mission to work in Canada and a pending application for refugee or asylum status when he left; the problem is that there is no evidence about what his work permit, or pending application, *means* in terms of § 208.15's requirement of "an offer of permanent resident status, citizenship, or some other type of permanent resettlement." On the other hand, Maharaj left Canada of his own volition to pursue what he perceived to be better opportunities in the United States, after invoking the process that Canada made available but without giving Canadian authorities a chance to confer, or not confer, some kind of permanent residence or resettlement status. Intuitively, this is a sensible reason to believe that asylum in the United States isn't necessary to protect him from persecution. But this, too, begs the question under the regulations, which is whether living, working, and applying for some type of refugee or asylum status amounts to a formal offer of resettlement such that the burden of showing that he was not in fact resettled shifted to Maharaj.

**[3]** Thus, we must decide what role, if any, the *Cheo* presumption plays in a case where there is evidence that an alien lived in a third country for four years, was permitted to work, and had an application for some kind of residence status pending. This leads us, in turn, to consider anew how best to interpret the firm resettlement regulation, and to clarify the construct under which we analyze whether the mandatory bar applies.

## C

**[4]** Unfortunately, the BIA has not revisited firm resettlement in a published opinion since *Soleimani* was decided in 1989 under a different, discretionary regime. However, our colleagues on other circuits have done so, and we benefit from their wisdom. There is general agreement (among circuits to comment) on several points:

*First*, the government bears the initial burden of showing "an offer of permanent resident status, citizenship, or some

other type of permanent resettlement" such that the firm resettlement bar applies and the burden shifts to the alien to rebut it. *See, e.g.*, *Sall*, 437 F.3d at 233-34 (noting that the IJ misstated the burden of proof by putting it on the applicant before the government established a prima facie case of firm resettlement); *Diallo*, 381 F.3d at 693 (holding that after the government meets its initial burden of demonstrating firm resettlement, the asylum-seeker may rebut the presumption by presenting evidence to the contrary or show that he falls within one of the two exceptions in § 208.15(a) and (b)); *Salazar*, 359 F.3d at 50-51 (noting that the government bears the initial burden of showing firm resettlement); *Abdille*, 242 F.3d at 491 (holding that "[u]nder the regulations, the INS bears the initial burden of producing evidence that indicates that the firm resettlement bar applies, and, should the INS satisfy this threshold burden of production, both the burden of production and the risk of non-persuasion then shift to the applicant to demonstrate, by a preponderance of the evidence, that he or she had not firmly resettled in another country"); *Mussie*, 172 F.3d at 332 (holding that "[o]nce the INS met its burden of introducing some evidence indicating that [petitioner] had been 'firmly resettled' in Germany, [the petitioner] bore the burden of demonstrating, by a preponderance of the evidence, that she had not been resettled"); *see also* *Abdalla*, 43 F.3d at 1399 (holding that once the government presents some evidence indicating that asylum is unavailable on the grounds of firm resettlement, the petitioner bears the burden of proving that such ground does not apply).

*Second*, the threshold showing of an offer can be made by direct, or indirect, evidence. However, as we shall explain, the circuits differ on whether non-offer-based evidence carries the same weight as offer-based evidence in making a prima facie, or threshold, showing. *Compare Abdille*, 242 F.3d at 486-87 (adopting an offer-based approach and allowing non-offer-based evidence at the threshold showing stage as a surrogate for offer-based evidence when direct evidence is not obtainable), *and Diallo*, 381 F.3d at 694 (same), *with Sall*, 437 F.3d

at 233 (adopting a broader, "totality of the circumstances approach" and treating non-offer-based evidence on a par with offer-based evidence).

*Third*, a grant of asylum, a residence permit, and travel documents indicating the permanence of a person's status are the type of direct evidence that may satisfy the government's threshold burden and support a finding of firm resettlement. Evidence of this order of magnitude has been present in virtually all published cases where a finding of firm resettlement has been upheld. *See, e.g.*, *Firmansjah*, 424 F.3d at 602 (petitioner had a permanent residence permit and entitlement to return to third country for residence purposes); *Salazar*, 359 F.3d at 51 (petitioner had the third-country residency stamp on passport that the third country had honored twice); *Rife*, 374 F.3d at 611 (the Israeli government offered petitioner permanent resettlement under the Law of Return, issued certificates evidencing citizenship, and issued passports); *Mussie*, 172 F.3d at 331 (petitioner was granted asylum in third country and had travel documentation from that country); *Abdalla*, 43 F.3d at 1399 (petitioner had a "residence" visa/permit). *Farbakhsh* is the notable exception, but it was decided under the superseded regime where firm resettlement was only one of several factors to be considered in deciding whether to grant or deny asylum.

**[5]** We agree with the consensus view that DHS bears the initial burden of showing "an offer of permanent resident status, citizenship, or some other type of permanent resettlement" under § 208.15. The regulation is plainly structured to require some evidence that an offer was received before the burden shifts to the alien to rebut it. The more difficult question is the nature of the threshold showing that will cause the burden to shift to the alien, or support a finding of firm resettlement in the absence of evidence to the contrary. On this the circuits part company. Some interpret § 208.15 as focusing the threshold showing primarily on direct, offer-based evidence of permanent resettlement, allowing indirect, non-offer-

based evidence to serve as a surrogate only if direct evidence cannot be obtained. Others interpret the threshold showing more broadly to encompass "the totality of the circumstances," including the length of the alien's stay in the third country, receipt of benefits, familial ties, and business and property connections. In the main, decisions following a "totality of the circumstances" approach stem from the law on firm resettlement as it developed under the pre-1990, discretionary regime. *See Abdille*, 242 F.3d at 485-86 (describing genesis of "totality of the circumstances" analysis).

**[6]** *Abdille* is the leading case that takes an offer-based approach. In the Third Circuit's view, "[i]t is readily evident from the plain language of § 208.15 that the prime element in the firm resettlement inquiry is the existence *vel non* of 'an offer of permanent resident status, citizenship, or some other type of permanent resettlement.' Thus, on its face, § 208.15 explicitly centers the firm resettlement analysis on the question whether a third country issued to the alien an offer of some type of official status permitting the alien to reside in that country on a permanent basis." *Id.* at 485 (citation omitted). The Seventh Circuit takes the same view. *Diallo*, 381 F.3d at 693 (stating that the "primary and initial consideration . . . is a simple one — whether or not the intermediary country has made some sort of offer of permanent resettlement").**[8]** We

---

**[8]**Others have a similar position. *See Salazar*, 359 F.3d at 50-51 (opining that the initial burden could be met "by producing evidence that the resettling country's government formally and affirmatively offered the alien permanent resettlement, a term which includes — but is potentially more expansive than — offers of citizenship or permanent residence"); *Rife*, 374 F.3d at 611 (stating that "the text of 8 C.F.R. § 208.15 makes this [whether the country of prior resettlement offered citizenship, permanent resident status, or some form of permanent resettlement] an important factor and, indeed, the proper place to begin the firm resettlement analysis," but leaving room for a formal offer not to be dispositive in accord with the Eighth Circuit's prior decision in *Farbakhsh*); *Elzour*, 378 F.3d at 1151 (agreeing with *Abdille* that § 208.15 "explicitly centers" the inquiry on an offer of some type of official status).

implicitly employed this analysis in *Cheo*, and explicitly adopted it in *Ali*. To the extent there is any doubt, we reaffirm agreement with *Abdille* that § 208.15 plainly focuses the firm resettlement inquiry on the existence *vel non* of an offer.

Consistent with our approach in *Cheo, Abdille* recognizes that "circumstances may arise in which the INS may not be able to secure direct evidence of a formal government offer of some type of permanent resettlement, and thus may . . . not be able to make the prima facie showing of firm resettlement under § 208.15 in that manner." 242 F.3d at 486-87 (noting that we faced such a situation in *Cheo*). In the event that direct evidence is unobtainable, "the IJ or BIA may find it necessary to rely on non-offer-based factors, such as the length of an alien's stay in a third country, the alien's intent to remain in the country, and the extent of the social and economic ties developed by the alien, as circumstantial evidence of the existence of a government-issued offer." *Id.* at 487. Such factors may serve as a surrogate for direct evidence of a formal offer "if they rise to a sufficient level of clarity and force." *Id.* Again, the Seventh Circuit is in accord. *Diallo*, 381 F.3d at 694 (recognizing that such circumstances may exist, but holding that the IJ erred as he neither considered whether there was an offer at all, nor suggested that he was using non-offer-based factors as a surrogate).[9]

Opting for a "totality of the circumstances" approach, the Second Circuit recently adopted a test under which immigration judges are to consider "whether [the petitioner] intended to settle in [the third country] when he arrived there, whether he has family ties there, whether he has business or property connections that connote permanence, and whether he enjoyed the legal rights — such as the right to work and to enter and leave the country at will — that permanently settled

---

[9]The First Circuit recognized the principle in *Salazar*, 359 F.3d at 50-51 & n.4, but found it unnecessary to resolve the disagreement among circuits because the IJ in that case did not rely on non-offer-based elements.

persons can expect to have. Of particular importance to this inquiry is whether he received an actual offer of permanent resident status." *Sall*, 437 F.3d at 235 (footnote omitted). The court gave two reasons, neither persuasive to us, for preferring the "broader conception of 'firm resettlement' " reflected in *Mussie*, *Abdalla*, *Farbakhsh*, and *Chinese American Civic Council*.[10] *Sall*, 437 F.3d at 232. First, the regulation refers to "some other type of permanent resettlement" and thus presumably contemplates that foreign statutes which are not the same as United States immigration provisions, and a foreign system which does not include written documentation or formal, state-issued identification cards, could nevertheless be recognized by immigration judges determining whether an alien was firmly resettled. *Sall*, 437 F.3d at 233. And second, "the underlying purpose of asylum regulations — to provide refuge to desperate refugees who reach our shores with nowhere else to turn — accords with reserving the grant of asylum for those applicants without alternative places of refuge abroad, regardless of whether a formal 'offer' of permanent settlement has been received." *Id*.

---

[10]*Sall* notes in parentheticals that the Fourth Circuit found firm resettlement in *Mussie* in part based on a six-year stay in a third country, receipt of government assistance, and renting of a personal apartment, but does not take note of the fact that the petitioner, who was a native and citizen of Ethiopia and fled to Germany where she lived, worked, and paid taxes for six years, was granted asylum in Germany and was issued German travel documentation. *Sall*, 437 F.3d at 232-33. It notes that the Tenth Circuit in *Abdalla* considered family ties, but does not take note of the fact that in addition to family ties, the petitioner possessed a "residence" visa/permit for the UAE. *Sall* notes that the Eighth Circuit in *Farbakhsh* listed a number of factors relevant to determining firm resettlement, and that the D.C. Circuit in *Chinese American Civic Council* found that Chinese asylum applicants had firmly resettled during a lengthy stay in Hong Kong, but does not take note of the different regime under which *Farbakhsh* and *Chinese American Civic Council* were decided, or of the importance that the D.C. Circuit attached to "the added assurance" that a Hong Kong ordinance gave to residents of more than seven years that they would not be deported.

We remain convinced by *Abdille*'s reasoning and approach. The regulation defining "firm resettlement" for purposes of the mandatory bar could have reserved the grant of asylum for aliens without other places of sanctuary "regardless of whether a formal 'offer' of permanent settlement has been received," as *Sall* and the dissent suggest, but it doesn't. Instead, semantically, § 208.15 expressly focuses the initial inquiry on entering the third country with, or receipt of, *an offer* of some type of permanent resettlement. It is only after this that, structurally, the regulation shifts the burden to the alien and permits consideration of the conditions of his stay in the third country. As the Seventh Circuit explained in *Diallo*, "[t]he regulations do allow the immigration judge to consider factors such as the length of time spent in the country, housing, and the type and extent of the refugee's employment, among others, but **only after** making a preliminary finding of a genuine offer *vel non* of permanent resettlement, and only then when the applicant seeks to demonstrate that she falls into one of the two exceptions." 381 F.3d at 693; *see Abdille*, 242 F.3d at 486 (explaining that § 208.15(b) prompts the IJ to consider the enumerated non-offer-based elements only in determining whether an exception applies).

Our dissenting colleagues would instead have "offer of" mean offer *or* — "for example, the length of the alien's stay in the safe third country, the alien's work history in the safe third country, or the alien's ability to take advantage of the safe third country's social services." Dis. op. at 6427. They suggest that "firm resettlement" is not coextensive with receipt of an offer of permanent resettlement because the regulation does not state that an offer is the exclusive means of showing firm resettlement, *id.* at 6427 n.4 & 6434, and because otherwise, the phrase "firm resettlement" wouldn't be necessary, *id.* at 6427 n.4. However, § 208.15 *defines* "firm resettlement" in terms of an alien who "entered into another country with, or while in that country received, an offer of . . . some other type of permanent resettlement." Thus, "firm resettlement" necessarily, and *by definition*, is coextensive

with *an offer*. Section 208.15 requires the existence *vel non* of *an offer* even though it doesn't say that "only" an offer qualifies, for an alien cannot possibly *enter* a third country with *a history there* of residence, work, or social services. Put differently, if permanent resettlement can be acquired without an offer through long-term residence, employment, and receipt of government benefits, an alien could never obtain "some other type of permanent resettlement" before entering the country and living there. Yet the regulation plainly contemplates that an alien *may* have "entered" a third country with an offer of "some other type of permanent resettlement" as well as with an offer of "permanent resident status" or "citizenship." In sum, we disagree that the regulation can be rewritten to read that the existence of an "offer" is one means, but not the exclusive means, of proving firm resettlement. *Id.* at 6434.

This said, under *Abdille* and the approach that we adopt, non-offer-based elements may still be considered at the threshold stage if DHS shows that direct evidence of an offer is unobtainable. Although not a perfect solution, this surrogate route comports with the regulation's offer-based focus, yet allows for the possibility that no direct evidence is available. Given this alternative, and given that § 208.15 was adopted when firm resettlement became a mandatory bar, we are not persuaded that the inquiry should be broadened beyond the regulation's plain focus or beyond its own burden-shifting scheme in order to capture the focus of a superseded, discretionary, non-burden-shifting regime. *See Diallo*, 381 F.3d 693-94 (observing that the "totality of the circumstances" analysis is now outdated).

If direct evidence is unobtainable and circumstantial evidence is received as a surrogate at the threshold stage, in order to shift the burden to the alien the evidence must be of sufficient force to show that the alien's length of residence, intent, and ties in the third country indicate that the third country officially sanctions the alien's indefinite presence. The focus

does not change; it remains on receipt of *an offer* of permanent resettlement. *See Firmansjah*, 424 F.3d at 602 (distinguishing the use of circumstantial evidence to prove an offer from the totality of the circumstances test).

We recognize that even so, § 208.15 has puzzling holes; it fails to say what "offer" means, and leaves "some other type of permanent resettlement" undefined as well. For present purposes we accept the common meaning of "offer" as "[t]he act or an instance of presenting something for acceptance." BLACK'S LAW DICTIONARY 1113 (8th Ed. 1999); *see also* WEBSTER'S II NEW COLLEGE DICTIONARY 759 (1995) ("offer" is "something offered, as a proposal, suggestion, bid, or invitation"; to "offer" is "to put before another for acceptance or rejection"). "The 'some other type of permanent resettlement' language likely was added to account for the great variety in names and types of permanent offers of settlement in countries around the globe and was not meant to be a catch-all that would undo the requirement of a governmental 'offer.' " *Diallo*, 381 F.3d at 694 n.5. It could include, for example, the type of ordinance that the D.C. Circuit found significant in *Chinese American Civic Council* for the assurance it gave of the alien's continued ability to stay in Hong Kong without deportation after living there for seven years. Apart from this, we leave the possibilities for "some other type" of permanent resettlement to evolve on a case-by-case basis.

While we also acknowledge the dissent's concern about opening "the door to rampant country-shopping," dis. op. at 6440, policy arguments, no matter how forceful, do not justify jettisoning the plain language of the regulation. Tightening up the criteria for firm resettlement does not seem an unreasonable thing for a regulation interpreting a *mandatory* bar to do, as it makes sense to require a more definitive showing of permanent resettlement when asylum is per se unavailable than when it may or may not be granted as a matter of discretion. In any event, the agency can always recede from the *Abdille* construction by changing the language of § 208.15, if it shares

the dissent's concern. Finally, we note that at the end of the day, the Attorney General retains discretion to deny asylum even when denial is not required by the firm resettlement regulation.

**[7]** Accordingly, we conclude that under the plain language of § 208.15, DHS bears the initial burden of showing that the government of the third country issued to the alien a formal offer of some type of official status permitting the alien to reside in that country indefinitely. This burden can be met by direct evidence of an offer of some type of permanent resettlement, or if DHS shows that direct evidence of a formal offer is unobtainable, then surrogate, non-offer-based evidence may suffice for the initial showing if it is of sufficient force for the IJ reasonably to infer that the third country officially sanctions the alien's indefinite presence. As DHS bears the burden of showing receipt of an offer, it also bears the burden of showing that the non-offer-based evidence upon which it relies signifies some kind of entitlement to stay indefinitely. In either case, once DHS points to some evidence of an offer of some type of permanent resettlement, the burden shifts to the applicant to show that the nature of his stay and ties was too tenuous, or the conditions of his residence too restricted, for him to be firmly resettled.

D

**[8]** Here, the IJ found both that Maharaj was never "actually granted refugee status, but it clearly was offered to him" — and that Maharaj "chose not to wait until it was offered." We cannot tell whether the IJ found an offer, or not. Nor can we tell what "refugee status," even if offered, signifies in terms of "permanent residence" or "some other type of permanent resettlement" under Canadian law.

**[9]** The record does show that Maharaj was in the process of applying for some kind of refugee or asylum status, and walked out on it. But the fact that Canada offers a process for

applying for some type of refugee or asylum status is not the same as offering the status itself. In *Elzour*, the Tenth Circuit addressed the similar situation of an alien who spent nearly four years in Canada after fleeing Syria and before entering the United States. Elzour had applied for asylum, but failed to appear for a mandatory hearing. His application was denied, as was a petition for permanent residence status based on his marriage to a Canadian citizen. Considering whether Elzour's ability to apply for asylum was itself "an offer" of permanent resettlement, the court noted that refugees may not unilaterally reject safe harbor in a third country in favor of seeking asylum in the United States. However, as the court explained, this depends upon whether the alien was entitled to claim permanent refuge or just had the possibility of asylum:

> [A] third country's offer of permanent resettlement may consist of providing a defined class of aliens a process through which they are entitled to claim permanent refuge. If an alien who is entitled to permanent refuge in another country turns his or her back on that country's offer by failing to take advantage of its procedures for obtaining relief, he or she is not generally eligible for asylum in the United States. In contrast, a mere possibility that an alien might receive permanent refuge through a third country's asylum procedures is not enough to constitute an offer of permanent resettlement.

*Elzour*, 378 F.3d at 1152. In other words, an alien may have an "offer" if the alien is *entitled* to permanent resettlement and all that remains in the process is for the alien to complete some ministerial act. The firm resettlement bar may apply if, instead of completing the process and accepting the offer of permanent resettlement to which the alien is entitled, the alien chooses to walk away. DHS bears the burden of adducing evidence that indicates the significance Canada attaches to the process in which Maharaj was engaged, and to the progress of his application. *See Abdille*, 242 F.3d at 489-92. As there

is no evidence in this record to indicate that Maharaj was entitled to permanent resettlement when he left Canada, there was no basis upon which to find an offer of permanent resettlement and so to shift the burden of rebuttal to Maharaj. We must remand so that the record can be developed with respect to whether Maharaj chose not to accept permanent refuge to which he was entitled, or turned his back only on the mere possibility of it.[11]

[10] Likewise, the IJ's determination was not based on substantial evidence to the extent that he found firm resettlement and shifted the burden to Maharaj on account of four years' residence, work, and benefits. DHS made no showing that offer-based evidence was unobtainable. Therefore, it had to adduce direct evidence of an offer of some type of permanent resettlement. A four-year residence alone is not sufficient, *see Diallo*, 381 F.3d at 696-97, and we cannot tell what made Maharaj eligible for the benefits he received, or what his work permit allowed, and whether eligibility for either means that Canadian authorities thereby recognized a right to stay indefinitely in that country. One can be allowed to work, or receive benefits, without being offered permanent resident status or some other type of permanent resettlement in this country, and we suppose also in Canada. But the record is undeveloped on this point as well.

---

[11]Although not applicable to Maharaj, we note that The Agreement Between the Government of the United States of America and the Government of Canada for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries, U.S.-Can., Dec. 5, 2002, *available at* http://canada.usembassy.gov/content/can_usa/Safe3rd_finaltext12-5-021.pdf, which became effective December 29, 2004, recognizes that both countries "offer generous systems of refugee protection" and provides, subject to exceptions, that aliens arriving in the United States from Canada at a land border port-of-entry shall be returned to Canada to seek protection under Canadian immigration law. The Agreement indicates that an alien may apply for asylum, withholding of removal or protection under the Convention Against Torture in one or the other, but not both, countries. *Id.*; *see also* 8 U.S.C. § 1158(a)(2)(A); 8 C.F.R. § 208.30(e)(6).

**[11]** The IJ's determination accordingly lacks support, and we remand for further proceedings consistent with this opinion.

## IV

**[12]** Maharaj also contends that, in light of the May 2000 coup in Fiji, he is eligible for withholding of removal because it is more likely than not that he will be persecuted upon his return to Fiji. The State Department Country Report on Human Rights Practice for 2000 catalogs violence against Indo-Fijians and specifically states that the areas near Maharaj's home province of Nausori "experienced a particularly high level of violence, including looting, arson, and physical intimidation directed against Indo-Fijians." However, we cannot make a determination on changed country conditions in the first instance. *INS v. Ventura*, 537 U.S. 12, 16-17 (2002) (per curiam) (requiring remand where the BIA had not decided the "changed circumstances" question). In its October 8, 2003 denial of Maharaj's motion to reopen, the Board stated that information about the 2000 coup was before it when it issued its prior decision. Yet, the BIA's February 27, 2003 decision affirming the IJ's denial of asylum and withholding of removal states only "that the record rebuts the assumption of future harm," and it gives no indication that the BIA considered evidence of changed conditions following the May 2000 coup. In any event, the BIA did not "make an individualized determination as to the effect of country conditions," *Lopez v. Ashcroft,* 366 F.3d 799, 806 (9th Cir. 2004), and remand is appropriate to allow the BIA to consider the issue in a way that allows for principled appellate review of its decision. In addition, we note that "remand could lead to the presentation of further evidence of current circumstances in [Fiji]." *Ventura*, 537 U.S. at 18.

## V

We conclude that the IJ's determination that Maharaj was firmly resettled lacks support. We grant the petition, and

remand so that the IJ may consider whether evidence that Maharaj had a right to work, receive benefits, and apply for some kind of refugee or asylum status in Canada constitutes "an offer of permanent residence, citizenship, or some other type of permanent resettlement" under the approach that we have adopted. We also remand to give the IJ an opportunity to make an individualized assessment of the risk to Maharaj of being returned to Fiji in light of changed country conditions.

PETITION GRANTED.

---

O'SCANNLAIN, Circuit Judge, with whom KLEINFELD, RAWLINSON, and CALLAHAN, Circuit Judges, join, concurring in part and dissenting in part:

While I agree that a remand to consider changed circumstances in Fiji is warranted with respect to the Maharajs' request for withholding of removal, I must respectfully dissent from the court's holding with respect to the merits of the Maharajs' asylum petition. I believe the Immigration Judge ("IJ") properly concluded that the Maharajs had been firmly resettled in Canada. In my view, the opinion of the court misconstrues the law of resettlement, opens our asylum process to an alien who is not fleeing from persecution, and invites abusive country-shopping.

I

The Maharajs fled Fiji in 1987, having experienced substantial persecution, *see* Maj. Op. at 6395-97, on account of their Indo-Fijian ethnicity. The family settled in Canada, where it sought refugee status and applied for asylum. The Maharajs lived undisturbed, legally and openly, in Canada for four years, during which time Mr. Maharaj worked as a full-time janitor and bakery deliveryman, while Mrs. Maharaj

received training to become a nurse's assistant and worked full-time caring for the elderly. The Maharajs rented an apartment, sent their children to free public school, and received free government-provided health care. Both Mr. and Mrs. Maharaj received Social Insurance Numbers and work authorization. Though the Maharajs disliked working menial jobs and felt that there was stigma attached to their status as refugees, they worshiped freely at a Hindu temple and developed friendships with non-Indians and non-Fijians in Canada.

The Immigration Judge ("IJ") concluded that the Maharajs lived free from persecution in Canada; indeed, it is undisputed that while living there, the Maharajs enjoyed the stability, freedom, and safety offered to Canadian immigrants. Yet the Maharajs, dissatisfied with the vocational opportunities in Canada, crossed the border into the United States. Mr. Maharaj explained that he "wanted to move to United States because, uh, [he] wanted to see what United States looks like" and that the "main thing was job. We never had a good job." Mrs. Maharaj testified that "we were not getting good job . . . . We wanted to, you know, go up and have more money and build ourself. So, that's the time when we thought we don't like Canada." When they arrived, they "liked this place much better than Canada, so [they] decided to stay here."

Once in the United States, the Maharajs overstayed the six month window permitted to visitors, and were served with Orders to Show Cause, charging them with deportability. The family conceded deportability, but requested asylum and withholding of removal. After hearing Mr. and Mrs. Maharajs' testimony, the IJ concluded that although Canada has a refugee program similar to that of the United States, the Maharajs voluntarily chose to leave Canada before Canadian authorities reviewed their petition. Indeed, when asked whether "it's possible that you could have refugee status in

Canada and not even know it," Mr. Maharaj answered, "Could be."[1]

The IJ concluded that the Maharajs "never were actually granted refugee status, but it clearly was offered them. They just chose not to take advantage of it, or not wait until it was offered them, or until there was a final resolution of the problem." Because the IJ concluded that the Maharajs had been firmly resettled in Canada, the IJ, in my view quite properly, denied asylum because of statutory ineligibility. *See* 8 C.F.R. §§ 208.13(c)(2)(i)(B), 208.15. The IJ also denied the Maharajs' request for withholding of removal on the grounds of changed circumstances in Fiji, which we are, quite properly, remanding to the IJ.

## II

Here the IJ concluded that—given the circumstances of the Maharajs' four-year sojourn in Canada—the Maharajs had been firmly resettled despite a concession by the government that the Maharajs' pending application for asylum there had not yet been authoritatively resolved. I suggest that in reversing the IJ's legal conclusion, the majority misreads the firm resettlement regulation in two respects. First, it too narrowly construes the catch-all provision. Second, it ignores the his-

---

[1]The INS attorney and Mr. Maharaj had the following dialogue:

Q. Have you at anytime after you've left Canada attempted to find out what the decision on your asylum application was in Canada?

A. No.

Q. You don't know what status you are in? You don't know if it was denied? You don't know if it was granted?

A. No, I don't.

Q. So, it's possible that you could have refugee status in Canada and not even know it?

A. Could be.

tory and purpose of the regulation by improperly reading the list of factors which the IJ can apply in determining "firm resettlement" as exhaustive.

## A

The plain text of §§ 208.15 and 208.13 allow the IJ significant latitude for finding that an alien "has been firmly resettled" based *not only* on "offers" of permanent resident status or citizenship, but also on the basis of "some other type of permanent resettlement." The phrase "some other type of permanent resettlement" must be read in the context of the preceding examples. *See*, *e.g.*, *Circuit City Stores v. Adams*, 532 U.S. 105, 114-115 (2001) (" '[W]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.' " (quoting 2A N. Singer, *Sutherland on Statutes and Statutory Construction* § 47.17 (1991))). Here the preceding objects— "permanent resident status" and "citizenship"—are non-temporary classifications which, if granted by a third country, relieve the fear of persecution in the native country. Similarly, "some other type of permanent resettlement" can include informal understandings, as might be seen in less developed immigration systems, as the majority concedes, but need not necessarily be so limited. Rather, the phrase could also encompass others types of "permanent resettlement" short of full citizenship, so long as circumstances of the arrangement are such that the alien is not at risk of being deported back to his native country.

Moreover, the regulation by its plain text does not require that the alien actually receive permanent resident status, citizenship, or some other type of permanent resettlement; rather, it only requires an "*offer*" of such. Thus, while "some other type of permanent resettlement" is a minimal requirement in itself, the regulations require even less: only a mere offer. The regulation's focus on an "*offer*" rather than on receipt of

"some other type of permanent resettlement" underscores that the resettlement question turns on whether the alien remains in fear of being returned to persecution in his native country. The text of the regulation clearly empowers the IJ to make just such an inquiry.

Under these circumstances, I would conclude that the Maharajs fall into such category: they were offered, and had accepted, the ongoing protection of the Canadian government while it processed their asylum application. Though that protection *may* at some point culminate in a formal "offer" of citizenship or other status, when the IJ evaluated the Maharajs' claim there was nothing to indicate that they would not be allowed permanently to resettle in Canada. Indeed, the IJ reasonably determined that the Maharajs were not just offered temporary resident status; rather, they were offered, and accepted, *indefinite* resettlement. The difference is crucial. While temporary status, by definition, entails a definitive ending point—and therefore necessarily means that the immigrant will be in flight again—*indefinite* resettlement does not create such worries. Here, the Maharajs' asylum and refugee applications were pending with the Canadian government. Until such time as the Canadian government acted on the applications, the Maharajs were free to remain in Canada. This arrangement, which is not temporary, qualifies under the regulatory definition and the IJ could properly so find. Simply, the lack of a formal "offer" is not dispositive where the conditions of the aliens' stay are such that there was no risk of deportation when they chose to leave.[2]

---

[2]In any event, there is a certain irony to the majority's holding, under these circumstances, that the Maharajs never received an "offer" of permanent resettlement. It was, after all, the Maharajs' voluntary choice to abandon prematurely their asylum application in Canada.

## B

## 1

To parse the regulation in more detail, § 208.15 states that "An alien is considered to be firmly resettled if . . . [he or she has] received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement." While the regulation plainly provides that a finding of an "offer" of permanent resident status, citizenship, or some other type of permanent resettlement automatically and conclusively bars the alien from applying for asylum, the regulation does *not* state that *only* such a showing establishes firm resettlement. Rather, because the regulation is not limited, other factors— for example, the length of the alien's stay in the safe third country, the alien's work history in the safe third country, or the alien's ability to take advantage of the safe third country's social services—may inform the IJ's firm resettlement analysis.[3] These factors, however, are discretionary and do not necessarily disqualify the asylum applicant.[4]

---

[3]The majority suggests that we misread "offer *of*" for "offer *or*." Maj. Op. at 6415. While we agree, of course, with the majority that the mandatory bar applies if the alien receives "an offer *of* permanent resident status, citizenship, or some other type of permanent resettlement," § 208.15 (emphasis added), we do not agree that *only* such a showing will suffice. My analysis is not rooted in the substitution of "of" for "or," but rather in the regulation's plain lack of exclusivity.

[4]Even granting, as the majority concludes, that the existence *vel non* of an "offer" is a " '*prime element* in the firm resettlement inquiry,' " Maj. Op. at 6412 (quoting *Abdille v. Ashcroft*, 242 F.3d 477, 485 (3d Cir. 2001)) (emphasis added), such conclusion is insufficient to construe the regulation definitively. Rather, we must still consider whether, as the majority concludes, the existence *vel non* of an "offer" should be the *exclusive* element in the firm resettlement inquiry. Though the existence of an "offer" is the proper starting place when considering firm resettlement, according to the regulations, the existence of an "offer" is merely one (of many) methods of determining whether an immigrant has been firmly resettled. By reading the existence of an "offer" for permanent resettlement as precisely coextensive with "firm resettlement," the majority dramatically, unnecessarily, and wrongly decreases the universe of factors that can contribute to a finding of firm resettlement.

Indeed, by reading the "firm resettlement" as coextensive with receipt of an "offer" of permanent resettlement, the majority renders the phrase

This interpretation fits with the purpose of the Refugee Act: to help those fleeing persecution. As the facts of this case show, it is not *only* those who have been offered permanent resettlement that are no longer fleeing persecution. The Maharajs did not receive a formal "offer" of permanent resettlement; yet, considering the circumstances of their stay, it is clear that they were not fleeing persecution. Over the course of four years, Mr. and Mrs. Maharaj were employed and received social services in the form of health care and education. On the basis of these factors, the IJ rightly determined that the Maharajs had firmly resettled in Canada.

2

The focus of the firm resettlement analysis has always been —and remains—whether the refugee remains in flight. Thus,

---

"firm resettlement" meaningless. If the regulations had intended to equate firm resettlement exactly with the existence of an "offer" for permanent resettlement, then why should the phrase "firm resettlement" appear in the regulations at all? Under the majority's reading, § 208.13(c)(2)(i)(B), which bars asylum applications for those "firmly resettled," should bar asylum applications for those who have received an offer, and § 208.15 should then define an "offer of permanent resettlement." That is *not* what the regulations say, though that is the effect of the majority's interpretation. In my view, the text and structure of the regulations treat "firm resettlement" as a broader concept than the existence of an "offer."

The majority contends, however, that this interpretation is inconsistent with the regulation, which "plainly contemplates that an alien *may* have 'entered' a third country with an offer of 'some other type of permanent resettlement[.]' " Maj. op. at 6415-16. The majority is mistaken. The regulation states that "An alien is considered to be firmly resettled if . . . he or she entered into another country with, *or while in that country received an offer* . . ." § 208.15 (emphasis added). Plainly, some forms of permanent resettlement may be received on "entr[y]"; others, however, may be received later. This broad language in no way precludes—and, if anything, demands—an interpretation that allows for consideration of certain types of permanent resettlement that accrue over time. Simply, the regulation's "or" phraseology clearly encompasses a variety of types of resettlement and the majority errs in giving a narrow reading to such plainly broad language.

the regulation requires that the adjudicator consider whether there is an "offer" of permanent resettlement as a means of determining whether the refugee remains in flight; however, the regulation still entertains other means of determining whether the refugee is fleeing persecution.

Such interpretation is the only one consistent with the Supreme Court's sole discussion of firm resettlement. In 1971, the Court considered the case of Yee Chien Woo, a native of Red China who had fled for Hong Kong in 1953, where he lived until 1960, when he moved to the United States. *See Rosenberg v. Yee Chien Woo*, 402 U.S. 49, 50 (1971). Considering the 1957 extension of the Refugee Relief Act, which omitted reference to "firm resettlement," the Court held that the firm resettlement doctrine still persisted in the new definition of "refugee" because "both the terms 'firmly resettled' and 'fled' are closely related to the central theme of all 23 years of refugee legislation—the creation of a haven for the world's homeless people." *Id*. at 55. The Court explained that:

> [The act] was never intended to open the United States to refugees who had found shelter in another nation and had begun to build new lives. Nor could Congress have intended to make refugees in flight from persecution compete with all of the world's resettled refugees for the 10,200 entries and permits afforded each year under [the statute]. Such an interpretation would subvert the lofty goals embodied in the whole pattern of our refugee legislation.

*Id.* at 56. The Court also announced that "the correct legal standard" to apply in cases where a petitioner has fled persecution is that the petitioner's "physical presence [in the United States] must be one which is *reasonably proximate to the flight* and not one following a flight remote in point of time or interrupted by intervening residence in a third country reasonably constituting a termination of the original flight in

search of refuge." *Id*. at 56-57 (internal quotation marks omitted and emphasis added).

In adopting the 1990 amendments, the INS intended to recognize the importance of the existence of an "offer" to analyzing firm resettlement.[5] I would not, however, take an unwarranted additional step and conclude that the INS intended to make the existence *vel non* of an "offer" for permanent resettlement the exclusive *sine qua non* of the refugee analysis. The Supreme Court's guidance in *Woo* should not be ignored; "firm resettlement" must still be understood with an eye towards overall refugee policy, whose "central theme" is related to the concepts "firmly resettled" and "fled." *Id.* at 55.

The Supreme Court's exegesis of "firm resettlement" in *Woo* is consistent with both the origins of, and the continuing rationale supporting, our refugee and asylum laws. The original congressional declaration of policies and objectives for the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (codified as amended in scattered sections of 8 U.S.C.), recognized that

---

[5]The majority relies heavily on 1990 amendments to the regulations, and discounts pre-1990 precedent. The majority concludes that "until October 1990 . . . an alien's resettlement elsewhere was only *a* factor to be considered by immigration judges, the BIA, and the courts in evaluating an asylum claim as a matter of discretion." Maj. Op. at 6403. After 1990, however, "the INS amended its regulations concerning firm resettlement, providing for a mandatory denial of asylum upon a finding of firm resettlement." *Abdille v. Ashcroft*, 242 F.3d 477, 483 n.4 (3d Cir. 2001). However, even assuming, as the majority argues, that the amendments " 'deemphasiz[ed] the previously paramount question whether the refugee remains in flight,' " and instead focused on " 'the actual existence vel non of an offer of permanent resettlement,' " Maj. Op. at 6404 (quoting Robert D. Sloane, *An Offer of Firm Resettlement*, 36 Geo. Wash. Int'l L. Rev. 47, 57 (2004)), that does not preclude the reality that the firm resettlement question—and the existence of an "offer"—is intertwined with the question of whether the refugee remains in flight.

it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands . . . . The Congress further declares that it is the policy of the United States to encourage all nations to provide assistance and resettlement opportunities to refugees to the fullest extent possible.

Refugee Act § 101.

Of course, a consequence of the international and cooperative nature of our obligations under the Refugee Act is that our obligations, by practical necessity, became limited. The most obvious limitations are the discretion bestowed on the Attorney General to accept or to reject the asylum application of a qualified refugee, *see* 8 U.S.C. § 1158(b)(1), and the numerical ceiling on the number of refugees that may be admitted into the United States each year, *see* 8 U.S.C. § 1157(a). These limitations are consistent with the Court's observation in *Woo* that "refugees in flight from persecution" should not be forced to compete with "the world's settled refugees," 402 U.S. at 56, for the finite number of places available in the United States each year. Further, these limitations underscore the importance of our task: Our refugee system is intended for those in flight, and in need of a safe harbor; in contrast, immigrants who *voluntarily* choose to abandon a perfectly safe haven may be abusing the generosity of the Refugee Act.[6]

---

[6]Not surprisingly, we have imported this policy objective into our case law. Most pertinently, in *Yang v. INS*, 79 F.3d 932 (9th Cir. 1996), the applicants sought asylum from Laos, having spent fourteen unmolested years in France subsequent to fleeing Laos. *Yang* noted that the statute is aimed at "the urgent needs of persons subject to persecution in their homelands," *id.* at 939, citing Refugee Act of 1980, § 101, and noted that persons firmly resettled elsewhere "are by definition no longer subject to persecution." *Id.*

We must consider these policy goals and limitations as part of a proper interpretation of § 208.15. I cannot support an interpretation of the regulations which constricts the analysis to only a single element, when the text of the regulations, their purpose, and Supreme Court precedent point to a broader construction.

3

Under our own case law, we long ago jettisoned the notion that § 208.15 requires an analysis exclusively aimed at the existence of an "offer." In our seminal case on the subject, *Cheo v. INS*, 162 F.3d 1227 (9th Cir. 1998), Meng Ly Cheo and Meng Heng Cheo, Cambodian nationals, fled to Vietnam and thence to Thailand, where they stayed for three years before entering the United States through Mexico. *Id.* at 1228. We concluded, however, that:

> Three years of peaceful residence established that the ground of "firm resettlement" in Malaysia might apply, so the Cheos had the burden of *proving that they were not firmly resettled*. That was enough time so that, in the absence of evidence to the contrary, it would be a reasonable inference from the duration that Malaysia allowed the Cheos to stay indefinitely. A duration of residence in a third country sufficient to support an inference of permanent resettlement in the absence of evidence to the contrary shifts the burden of proving absence of firm resettlement to the applicant.

*Id.* at 1229 (emphasis added) (citing *Abdalla v. INS*, 43 F.3d 1397, 1399 (10th Cir. 1994), and *Chinese Am. Civic Council v. Attorney General*, 185 U.S. App. D.C. 1, 566 F.2d 321, 328 n. 18 (D.C. Cir. 1977)). We did *not* state that the *Cheo* presumption requires an immigrant prove that he or she has "not received an offer," but rightly required the immigrant prove that he or she is "not firmly resettled." Critically, therefore,

*Cheo* concluded that other facts *besides* the existence of an "offer" can show firm resettlement.[7]

Our later case law applying *Cheo* is consistent with a broader reading of the regulation. In *Andriasian v. INS*, 180 F.3d 1033 (9th Cir. 1999), the petitioner fled Azerbaijan with his family, escaping to Armenia. *Id.* at 1036. The family moved between Russia, Armenia, and the Ukraine, nine times over the next forty-four months, though the petitioner testified that the family did not report any substantial problems living in Armenia. *Id.* at 1039. On this basis, the IJ concluded that the petitioner firmly resettled in Armenia. We reversed, concluding that firm resettlement "precludes asylum, unless the application can demonstrate that his stay in the third country lasted only until he could arrange for further travel or that the conditions of life in that country would be unduly restrictive." *Id.* at 1043. This in no way precludes the consideration of additional factors to determine whether the petitioner has firmly resettled. Indeed, *Andriasian* is consistent with *Woo*'s explanation that:

> many refugees make their escape to freedom from persecution in successive stages and come to this country only after stops along the way. Such stops do not necessarily mean that the refugee's aim to reach these shores has in any sense been abandoned. . . . The presence of such persons in this country is not "one which is reasonably proximate to the flight" or is "remote in point of time or interrupted by intervening residence in a third country."

---

[7]Indeed, other Circuits have understood our precedents perfectly well. For example, the Seventh Circuit explicitly rejected *Cheo* and concluded that "the primary and most important inquiry in any analysis of firm resettlement is whether or not the stopover country has made some type of "offer" of permanent resettlement." *Diallo v. Ashcroft*, 381 F.3d 687, 693-94 (7th Cir. 2004) (explicitly rejecting *Cheo*); *Firmansjah*, 424 F.3d at 602 (same).

402 U.S. at 57 n.6. Unlike the Supreme Court's warning in *Woo*, or the meanderings in *Andriasian* itself, the Maharajs stayed in Canada—and Canada alone—for four years. It is clear from these facts that Canada was not a mere stopover; it was the destination in which they first intended to resettle and did so.[8]

In sum, our prior case law, in accordance with the language of the regulation, allowed consideration of a variety of factors to show firm resettlement. *Cheo* properly put the focus of the analysis on "firm resettlement," rather than on the existence *vel non* of an "offer" for permanent resettlement. Again, based on our precedent, the history, text, and structure of the regulation, and Supreme Court precedent, I cannot agree that the regulation requires exclusive focus on one factor; rather, the existence of an "offer" is *one* means of proving firm resettlement—and is determinative if shown—but it is not the *exclusive* means of proving firm resettlement.

---

[8]*Ali v. Ashcroft*, 394 F.3d 780 (9th Cir. 2005), to which the majority repeatedly cites, simply does not apply to the facts of this case. In *Ali*, the petitioner, a Somali refugee, spent five years in Ethiopia as an undocumented alien attempting to arrange travel to a safe third country that would offer her permanent resettlement. *Ali*, 394 F.3d at 783-84. *Ali* properly concluded that "the fact that Ali fortuitously evaded detection by the government while living illegally in Ethiopia does not allow for a finding that Ali was firmly resettled." *Id.* at 790. In contrast, the Maharajs lived openly and freely in Canadian society. Ali, as an illegal, undocumented worker in an inhospitable environment was not similarly situated to the Maharajs.

For similar reasons, *Camposeco-Montejo v. Ashcroft*, 384 F.3d 814 (9th Cir 2004), is inapplicable. As we noted in that case, the petitioner "certainly did not experience in [the third country] the freedom and complete lack of 'molestation or persecution' that seemed to characterize the applicants' stays in Cheo and Vang." *Id.* at 820 (citing *Cheo*, 162 F.3d at 1228). Because of the various restrictions and difficulties suffered by that petitioner, his application would not be barred under § 208.15(b) regardless.

## C

Under a proper reading of the regulations, a variety of factors may be considered as part of the analysis of firm resettlement. If the petitioner has been offered permanent resident status, citizenship, or another type of permanent resettlement, then "firm resettlement" is established and the asylum petition must be denied, unless the petitioner establishes that one of the two exceptions provided at § 208.15(a)-(b) apply. However, if no "offer" of permanent resident status, citizenship, or other type of permanent resettlement is made, the IJ may still consider the facts of the case to determine whether the totality of the circumstances indicate that the petitioner had firmly resettled in the third country. This interpretation fits with the broader asylum policy, and the concept that asylum is for those in need. *See Sall v. Gonzales*, 437 F.3d 229, 233 (2d Cir. 2006) (per curiam) (noting that "the underlying purpose of asylum regulations—to provide refuge to desperate refugees who reach our shores with nowhere else to turn—accords with reserving the grant of asylum for those applicants without alternative places of refuge abroad"); *see also id.* (noting that while aliens physically present in the United States are generally allowed to apply for asylum, 8 U.S.C. § 1158(a)(2)(A) exempts any alien who could be removed to a "[s]afe third country").

Applying such construct to the facts of this case, the IJ rightly denied the asylum petition. The facts overwhelmingly indicate that the petitioners had firmly resettled in Canada: the Maharajs had jobs and received job training, enjoyed free health care and education, experienced no substantial discrimination, and appeared to enjoy a relatively peaceful existence. Thus, the IJ had the authority to conclude that the Maharajs had been firmly resettled in Canada. Having so concluded, the IJ rightly determined that neither of the exceptions in § 208.15(a)-(b) applied, and therefore the firm resettlement bar required the denial of the asylum petition. Simply, "[t]he United States offers asylum to refugees not to provide them

with a broader choice of safe homelands, but rather, to protect those arrivals with nowhere else to turn." *Id.* I would, therefore, deny the petition for review.

## III

I agree with the majority that there is a split of authority among the circuit courts of appeals; regrettably, the majority follows the weaker line of the Third and Seventh Circuits, rather than the more persuasive view of the Second, Fourth, Eighth, and D.C. Circuits. In Second Circuit's opinion in *Sall v. Gonzales*—the most recent discussion of this issue—the petitioner was a native and citizen of Mauritania who fled to Senegal. 437 F.3d at 231. Sall stayed in a Red Cross camp for four-and-one-half years, then moved to the capital of Senegal, Dakar, where he stayed for another nine months before paying for transportation to the United States. *Id.* The IJ concluded that Sall was ineligible for asylum because he had firmly resettled in Senegal, having lived there for approximately five years with no impediments to work or travel. *Id.* at 232. On review, the Second Circuit reviewed the IJ's conclusion with an eye toward the *purpose* of the asylum regulations: "to provide refuge to desperate refugees who reach our shores with nowhere else to turn." *Id.* at 233. Thus, it was proper to "reserv[e] the grant of asylum for those applicants without alternative places of refuge abroad, *regardless of whether a formal 'offer' of permanent settlement has been received.*" *Id.* (emphasis added).

Turning to the text of the regulations, the Second Circuit rightly noted that while "the regulation places particular importance on the presence *vel non* of an actual "offer" of permanent resident status," the "language of the regulation . . . requires an IJ to examine the specific circumstances of an applicant's case to decide whether he has firmly resettled in a third country." *Id.* Thus, *Sall* instructed the IJ to

> consider the totality of the circumstances, including whether Sall intended to settle in Senegal when he

arrived there, whether he has family ties there, whether he has business or property connections that connote permanence, and whether he enjoyed the legal rights—such as the right to work and to enter and leave the country at will—that permanently settled persons can expect to have. Of particular importance is whether he received an offer of permanent resident status.

*Id.* at 235.

Here, the facts show that the Maharajs intended to settle in Canada, that they have family ties to Canada, that they were employed in Canada, that they have permanent (or at least non-temporary) housing in Canada, and that they enjoyed rights and privileges commensurate with Canadian citizens. I agree with *Sall*'s statement that an "offer" of permanent resident status is "of particular importance"; however, the Second Circuit is also correct that this inquiry is not a *sine qua non* of a firm resettlement analysis.

Under facts virtually indistinguishable from those presented here, the Eighth Circuit considered the case of an Iranian native and citizen who fled to Spain. *Farbakhsh v. INS*, 20 F.3d 877 (8th Cir. 1994). Shortly after arriving in Spain, the petitioner "filed an application for refugee status in Spain." *Id.* at 880. Farbakhsh stayed in Spain for almost four years, though he "did not have official permission to work or study in Spain." *Id.* When the petitioner left, his application for refugee status was still pending. *Id.* Nevertheless, the IJ concluded, and the BIA agreed, that the petitioner "had 'firmly resettled' in Spain and was no longer fleeing persecution when he entered the United States." *Id.*

On review, the Eighth Circuit concluded:

We hold the record supports the Board's finding that petitioner had firmly resettled in Spain. Petitioner

had lived more than four years in Spain without fear of being returned to Iran; he initially intended to remain in Spain because he filed an application for refugee status there; his application for refugee status was pending; his younger brother and younger sister were living in Spain. Moreover, petitioner's travels do not suggest that his arrival in the United States in 1987 was reasonably proximate to his flight from persecution in Iran in 1982.

20 F.3d at 882.

In short, the "firm resettlement" bar prohibited consideration of Farbakhsh's asylum application, *even though* he had not received an "offer" of permanent resettlement from Spain. The Eighth Circuit rightly concluded that an asylum application, coupled with an undisturbed and lengthy stay in the third country, was sufficient to bar the application at the IJ's discretion (as opposed to a finding of firm resettlement, which mandates denial of the application). *See also Chinese American Civic Council v. Attorney General*, 566 F.2d 321 (D.C. Cir. 1977) (noting that "[a]ppellants did not present any facts to rebut the normal conclusion from such extended residence that appellants were firmly resettled and no longer in flight" and citing *Woo*, 402 U.S. at 49, for support).

The Eighth Circuit recently reiterated this view in *Rife v. Ashcroft*, 374 F.3d 606 (8th Cir. 2004):

We agree with the Third Circuit in *Abdille* that the text of 8 C.F.R. § 208.15 makes [an offer of permanent resettlement] an important factor and, indeed, the proper place to begin the firm resettlement analysis. But in some cases it will not be dispositive. For example, in our only decision resolving a firm resettlement issue, we affirmed the BIA's determination that the alien's four-year stay in Spain constituted firm resettlement even though his application for ref-

> ugee status in Spain was still pending when he came
> to the United States.[9]

*Id.* at 611. I agree, along with the Eighth Circuit, that an "offer" of permanent resettlement is "the proper place to *begin* the firm resettlement analysis"; the majority here errs by claiming that an "offer" of permanent resettlement is the proper place to *end* the firm resettlement analysis.

The Fourth Circuit adopted a similar approach. In *Mussie v. INS*, 172 F.3d 329 (4th Cir. 1999), the petitioner was a native and citizen of Ethiopia who fled to Germany. *Id.* at 330. Mussie applied for, and was granted, asylum in Germany, though the record did not disclose whether she received permanent resident status. *Id.* Mussie received government-paid language schooling, and monetary assistance for transportation, rent, and food. *Id.* at 330-31. With some relatively minor exceptions, Mussie lived peacefully in Germany for approximately six years. *Id.* at 331.

On review, the Fourth Circuit noted that although "the record is silent as to whether Mussie actually received a formal "offer" of permanent residency in Germany, the INS introduced sufficient 'evidence indicating' that Mussie had received at least an offer of 'some other type of permanent resettlement' in Germany, thereby meeting its evidentiary burden." *Id.* at 331 (quoting § 208.15). Supporting this conclusion, *Mussie* noted that the petitioner "received government assistance for language schooling, transportation, rent, and food; held a job; paid taxes; and rented her own apartment." *Id.* at 332.

---

[9]As noted by the majority, *Farbakhsh* relied on *In re Soleimani*, 20 I. & N. Dec. 99, 104 (1989), which is arguably outdated. Yet, the Eighth Circuit's pronouncement in *Rice* clearly treats *Farbakhsh* as precedential authority. Thus, despite the majority's claims to the contrary, its analysis conflicts with the Eighth Circuit's.

Similarly here, the Maharajs received a variety of government benefits, including free health care and schooling, held jobs, and rented an apartment. Unlike Mussie, the Maharajs' asylum petition was still pending when they chose to leave Canada; yet, the evidence indicated that the Maharajs and the Canadian government were in stasis, much like the relationship between Mussie and the German government. While both the Maharajs and Mussie had something less than an explicit "offer" of permanent resettlement, the facts and circumstances surrounding their lives in Canada and Germany, respectively, indicate that an IJ could have reasonably concluded that both had established an "other type of permanent resettlement."

In sum, other Circuits have rejected the improperly narrow reading of the regulations promulgated by the majority. Moreover, several Circuits have done so recently, belying the majority's claim that the 1990 amendments to the regulations dramatically altered the "firm resettlement" analysis.

IV

I am also persuaded that public policy concerns reinforce the IJ's interpretation here. The majority's analysis will open the door to rampant country-shopping, a result that our immigration laws have long sought to avoid. *See*, *e.g.*, *Kalubi v. Ashcroft*, 364 F.3d 1134, 1140 (9th Cir. 2004) (noting that "[i]n an appropriate case, 'forum shopping' might conceivably be part of the totality of circumstances that sheds light on a request for asylum in this country"); Susan F. Martin and Andrew I. Schoenholtz, *Asylum in Practice: Successes, Failures, and the Challenges Ahead*, 14 GEO. IMMIGR. L.J. 589, 606 (noting that "[m]ost advanced Western nations have adopted the principle in their asylum laws that the first safe haven country to which a refugee flees should be the one in which he or she seeks asylum" in order to reduce "asylum-shopping"). Indeed, the facts of this case demonstrate the likely effect of the majority's narrow reading of § 208.15. The

Maharajs lived peacefully in Canada for four years, enjoying that country's social and economic benefits. Dissatisfied *with life in Canada*—rather than *with life in Fiji*—the Maharajs decided to move to the United States. What a blatant abuse of the refugee and asylum system! It is undisputed that the Maharajs were no longer fleeing from persecution when they came to the United States. *By their own admission*, they were merely dissatisfied with their job prospects in Canada. While the desire to enjoy improved economic circumstances may motivate many immigrants, it is emphatically *not* a reasonable or a proper basis for granting an asylum petition.

Indeed, the Maharajs—who apparently immigrated for economic gain—may not be the worst example. Nothing in the majority opinion prevents an immigrant who flees his native country, settles into a new third country, lives there legally (under any status short of a formal "offer" of permanent resettlement), enjoys peace and prosperity in the third country for many years, then, having decided that the grass is greener in the United States, immigrates here. Such a hypothetical immigrant could apply for asylum—a system intended "to respond to the *urgent needs* of persons subject to persecution in their homelands," Refugee Act § 101 (emphasis added)—and the firm resettlement bar, amazingly, would not apply. Considering our hypothetical immigrant, who could be further from the platonic refugee? This immigrant enjoys safety, prosperity, and security offered by the third country, and the immigrant's move is motivated by economics rather than fear. Yet the majority is willing to reward him by allowing the asylum petition to proceed.

I would add that country-shopping is particularly egregious where, as here, the petitioner has an asylum petition pending in another safe third country when he arrives here. These petitioners may be seeking better economic opportunities or may be attempting to game the immigration law system, but what is *certain*, is that these petitioners do *not* need the asylum in the United States to protect them from persecution. Given that

the Refugee Act allows the granting of only a limited number of asylum petitions, and is intended to respond to the dire and urgent needs of a deserving group of people, the effect of the majority's unnecessarily narrow reading of § 208.15 is most problematic.

What's more, let's not lose sight of the forest for the trees. The likely effect of the majority opinion will be to increase greatly the government's burden in asylum cases. Once the alien denies having received a formal offer, the burden shifts to the government to prove that the alien did receive some sort of offer. However, the circumstantial evidence which the Department of Homeland Security ("DHS") typically uses to prove an asylum case will be largely useless. This case is a perfect example of the difficulty DHS will face in future asylum proceedings: During their hearing, the Maharajs admitted to living a perfectly happy life in Canada; yet the circumstances of their stay, under the majority construct, may only be used to show whether or not the Maharajs received an "offer." If the evidence shows that they did not receive an offer, *any* other evidence—*even if patently and obviously probative*—is automatically disregarded. Simply, the majority's construct will hamstring DHS to an intolerable and unreasonable degree in future asylum proceedings.

V

The Maharajs emigrated from Canada, where they had lived peacefully for four years, not from Fiji, where they were persecuted. The majority's unnecessarily narrow reading of "firm resettlement"—focusing exclusively on an "offer"— ignores the Supreme Court's guidance on how to interpret our asylum laws. As a result, the majority opinion puts us on the wrong side of a circuit split and invites blatant country-shopping. I respectfully dissent.