# United States Court of Appeals
## For the First Circuit

No. 02-2486

ALDO SALAZAR, CARMEN RODRIGUEZ SALAZAR,

Petitioners,

v.

JOHN ASHCROFT, Attorney General,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Selya, Circuit Judge,
Cyr, Senior Circuit Judge,
and Lynch, Circuit Judge.

Robert M. Warren for petitioners.

Thankful T. Vanderstar, Office of Immigration Litigation, with whom Linda S. Wernery, Senior Litigation Counsel, Office of Immigration Litigation, and Peter D. Keisler, Assistant Attorney General, Civil Division, were on brief for respondent.

February 26, 2004

**LYNCH**, **Circuit Judge**. Aldo Salazar, a native and citizen of Peru, petitions for review of the Board of Immigration Appeals's denial of his application for asylum and withholding of removal. Carmen Rodriguez Salazar, his wife and a native and citizen of Venezuela, is a derivative asylum applicant. Both Salazars were admitted to the United States as visitors for pleasure and overstayed. The Salazars are apparently hardworking members of their community; they have many supporters and present a sympathetic case. Whether that outweighs their illegal presence was something the immigration authorities might have considered in the exercise of their prosecutorial discretion as to whether to seek deportation. A court, restricted in its review of the decisions made by immigration authorities, has no such discretion.

The agency's determination that Salazar was "firmly resettled" in Venezuela, and so ineligible for asylum in the United States, is supported by substantial evidence. INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992); 8 C.F.R. §§ 208.13(c)(2)(1)(B), 208.15. We must deny the petition for review because firm resettlement in a third country is a mandatory bar to the granting of asylum. This marks our first occasion to address the firm resettlement doctrine.

**I.**

The Immigration Judge ("IJ") found Salazar's testimony credible. We describe the historical facts as Salazar recounted them at his hearing and in his application for asylum.

Salazar asserts that he would be in danger if returned to Peru because of the terrorist group Sendero Luminoso, or Shining Path, which has operated in Peru for over twenty years. The Shining Path opposes landowners and seeks to destroy farm ownership arrangements. Its members, Salazar explained, "do not want [those who] have money to exist."

Salazar's father owned a 103 acre farm in San José, Peru on which the family raised cattle for milking. In 1984, the Shining Path destroyed the nearest neighboring farm and damaged the Salazar farm. In response to that attack and to the Shining Path's announcement of its intent to "destroy the rest of the people that continue having properties" and "redistribute the wealth to everybody," Salazar's father "sold a great piece of the land" and sold many of the animals. He also resigned in 1984 as a rural judge, a position that he had held for a few years. No one else in the Salazar family held any political or official positions. In 1986, the Shining Path stole many of the Salazars's remaining horses, cows, and sheep, as well as most of their food supply. From that point, the Shining Path constantly harassed the Salazar

family -- coming to the farm and disturbing them at all different hours and distributing their land to others.

As a result of the threat from the Shining Path, the Salazar family began to abandon the farm in 1989. Gilmer Salazar, petitioner's older brother, did not leave the farm and was killed when the Shining Path dynamited the Salazar house in 1990. The rest of the family scattered throughout Peru, and petitioner's parents moved to Trujillo, where they constantly changed their names and tried not to go out in public.

Salazar himself traveled around Peru trying to stay far away from danger. He first went to Lima for one year, then traveled in the south of Peru for half a year because of terrorism in Lima, and then moved to the west of Peru. He did not want to leave Peru and remained there until July or August 1992 when he decided that he had to leave because of the danger. He left Peru, entered Ecuador, and stayed for a very brief time. He then moved on to Colombia, where he stayed for two months and worked to have money to continue with his trip. In October or November 1992, he traveled to Venezuela and entered the country illegally. He lived in Venezuela for at least fourteen months, worked there, and rented an apartment.

A Venezuelan passport was issued to Salazar on November 29, 1993. Salazar explained that he needed to be a Venezuelan resident to obtain a visa to the United States, and that "I met a

man in Venezuela that told me that he could arrange [to have a resident stamp placed on my passport] for me if I paid him something." Salazar paid, a resident stamp was placed in his passport, and in December 1993 he applied for and received a visa from the United States Embassy to enter this country as a visitor for pleasure. Salazar says that he had always planned to come to the United States. He did not make any effort to obtain a visa to come to the United States from Peru. He met Carmen, his now wife, in Maracaibo while on line at the United States Embassy to request the visa, and they traveled together to the United States in February 1994. They were admitted as visitors for pleasure and authorized to stay until August 1994. Salazar never sought asylum in Ecuador, Colombia, or Venezuela.

Carmen and Aldo Salazar were married in the United States. Salazar's asylum application is dated April 13, 1994. Salazar and his wife left the United States twice after the submission of the application. They traveled to Venezuela on August 11, 1994 and returned to the United States a day later. They again traveled to Venezuela on February 10, 1995 and returned to the United States on February 26, 1995. On both trips, Salazar was readmitted to Venezuela as a Venezuelan resident. He testified that he showed the authorities his passport and they admitted him "with the residence that [he has]."

In 1996, the Shining Path killed Salazar's uncle, Antonio Salazar Contreras, who was a farmer and who lived near what used to be the Salazar family farm. The evidence that Shining Path was responsible for the murder, Salazar explained, was "the way he died because he was tortured" and strangled and "[t]hey left some papers, warnings, saying that this is the way the people are going to die if they don't let, leave their properties." Salazar said that his uncle was killed "[b]ecause he was there and he was still maintaining his property." Salazar believes that he would be in danger in Peru "because my family, my brothers and myself who were declared enemies of that Shining Path and we were threatened if we return." The threats were made on a "few occasions when we were there. Because we were in farm, we tried to defend ourselves and because of that, they put us in the black list." Salazar believes that the Shining Path declared his family to be enemies "because we . . . did not want to leave our property and I think it was more because we always tried for the police to protect us." Salazar said he had only one instance of personal contact with members of Shining Path. He testified, "I was walking . . . and I saw armed men and they asked me some things and that was it."

Salazar's parents and three of his siblings still reside in Peru. His other four surviving siblings live in the United States. According to a year 2000 country condition report, the Shining Path is still operating in Peru and is still responsible

for numerous murders. The threat from the Shining Path has declined, though, and Salazar admitted that he was aware that Peru's government had captured a number of Shining Path leaders.

On August 31, 1999, the INS issued Aldo and Carmen Salazar notices to appear, charging them as deportable for having remained in the United States longer than authorized. The Salazars conceded deportability and sought asylum and withholding of deportation. The IJ found that Salazar has the status of a resident in Venezuela and so was "firmly resettled" under 8 C.F.R. 208.15 and ineligible for asylum. The IJ also held that Salazar had otherwise failed to establish asylum eligibility. The IJ found that although Salazar was at one time a member of a landowning family targeted by the Shining Path, he had ceased to be within that targeted social group when his family sold their property, moved, and safely resided elsewhere in Peru. Salazar's fear of persecution, the IJ determined, was not well-founded, and there was no basis for concluding that he would face a risk of harm in Peru on account of any asylum-eligible category. The IJ denied Salazar's application and granted him voluntary departure. The Board of Immigration Appeals ("BIA") affirmed without opinion, and Salazar filed this petition for review.

## II.

The Attorney General has discretion to grant asylum to an alien applicant "if the Attorney General determines that such alien

is a refugee within the meaning of [8 U.S.C.] section 1101(a)(42)(A)." 8 U.S.C. § 1158(b)(1). An asylum applicant bears the burden of establishing that he fits within the statutory definition of refugee, 8 C.F.R. § 208.13(a), a burden that involves proving "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. 1101(a)(42)(A); see 8 C.F.R. § 208.13(b); Khem v. Ashcroft, 342 F.3d 51, 53 (1st Cir. 2003).

Under 8 C.F.R. § 208.13(c)(2)(1)(B), which applies to asylum applications filed before April 1, 1997, asylum may not be granted to any applicant who "[h]as been firmly resettled within the meaning of [8 C.F.R.] § 208.15." Section 208.15 states:

> An alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement unless he or she establishes:
> (a)    That his or her entry into that country was a necessary consequence of his or her flight from persecution, that he or she remained in that country only as long as was necessary to arrange onward travel, and that he or she did not establish significant ties in that country; or
> (b)    That the conditions of his or her residence in that country were so substantially and consciously restricted by the authority of the country of refuge that he or she was not in fact resettled. In making his or her determination, the asylum officer or immigration judge shall consider the conditions under which other residents of the country live; the type of housing, whether permanent or temporary, made available to the refugee; the types and extent of employment available to the refugee; and the extent to which the refugee received

-8-

permission to hold property and to enjoy other rights and privileges, such as travel documentation that includes a right of entry or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country.

In 1996, Congress codified the rule that a finding of firm resettlement operates as a mandatory bar[1] to the grant of asylum. 8 U.S.C. § 1158(b)(2)(A)(vi); see 8 C.F.R. § 208.13(c)(1) (explaining that asylum applications filed on or after April 1, 1997, the effective date of the 1996 codification, are subject to the statutory firm resettlement rule). That codification is not retroactive, see Pub. L. No. 104-208, § 604(c), 110 Stat. 3009 (1996), so it does not apply to petitioner.[2] The applicable firm resettlement rule is the one contained in 8 C.F.R. § 208.13(c)(2)(1)(B), and that regulation is entitled to deference. INS v. Aguirre-Aguirre, 526 U.S. 415, 424-25 (1999); Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844 (1984); Costa v. INS, 233 F.3d 31, 34 (1st Cir. 2000).

---

[1] It was not always true that firm resettlement was a mandatory bar to asylum. See Abdille v. Ashcroft, 242 F.3d 477, 483 n.4 (3d Cir. 2001).

[2] Salazar filed his asylum application on April 13, 1994. The IJ determined that Salazar abandoned that application by leaving the United States and traveling to Venezuela after filing it. The IJ decided that it was best to continue the proceedings despite the abandonment and allowed the date of the asylum application to be amended to February 26, 1995, the date of Salazar's return to the United States after his second trip to Venezuela. The difference in the two application dates is immaterial to our analysis.

A finding of "firm resettlement" is reviewed under the deferential substantial evidence standard. Mussie v. INS, 172 F.3d 329, 331 (4th Cir. 1999) (applying the substantial evidence standard to the BIA's finding of firm resettlement); cf. Elias-Zacarias, 502 U.S. at 481. The BIA's finding of firm resettlement must be upheld unless the evidence not only supports a contrary conclusion, but compels it. Elias-Zacarias, 502 U.S. at 481 & n.1; Albathani v. INS, 318 F.3d 365, 372 (1st Cir. 2003).

There is a two part analysis under 8 C.F.R. § 208.15. First, there is the question whether the alien is "firmly resettled" within the meaning of the regulation. See Mussie, 172 F.3d at 331-32. The government bears some initial burden of showing firm resettlement. See id. at 331-32. The case law treats this showing made by the government as creating a rebuttable presumption,[3] see id.; Cheo v. INS, 162 F.3d 1227, 1229-30 (9th Cir. 1998); Abdalla v. INS, 43 F.3d 1397, 1399 (10th Cir. 1994), which the alien can overcome on showing otherwise "by a preponderance of the evidence." 8 C.F.R. § 208.13(c)(2)(ii). Second, if the alien fails to rebut the presumption, there is the question whether the alien can show that he falls within either

---

[3]    Some case law, but not the regulations, calls the initial showing of firm resettlement by the government a "prima facie case" that shifts the burden to the applicant. See Abdille, 242 F.3d at 486. Whether or not the prima facie case analogy is correct, there is burden shifting, and that shifting sensibly reflects the difficulties of obtaining proof faced by the government.

-10-

exception (a) or exception (b).  See Mussie, 172 F.3d at 332.  The alien bears the burden on both exceptions.  8 C.F.R. § 208.15; see Mussie, 172 F.3d at 332.

We have not previously addressed the "firm resettlement" bar in § 208.15.  It seems clear that the government may make its initial showing of firm resettlement by producing evidence that the resettling country's government formally and affirmatively offered the alien permanent resettlement, a term which includes -- but is potentially more expansive than -- offers of citizenship or permanent residence.[4]  In the instant case, the government readily met its burden by pointing to a facially valid government offer of permanent residence: the Venezuelan residency stamp on the Salazar passports, as well as uncontroverted evidence that the Venezuelan government twice honored that stamp when the Salazars made return trips to Venezuela.

Since the government satisfied the requisite initial showing, the burden shifted to the Salazars to rebut the

---

[4]    There is a disagreement among courts concerning the distinct issue as to whether the government may make its initial showing exclusively by direct or circumstantial evidence of the government's offer of permanent settlement, or whether it may do so through other "non-offer-based elements," such as the alien's establishment of significant familial or business ties or the prolonged duration of the alien's residence in the resettlement country without any government efforts to deport him.  See, e.g., Abdille v. Ashcroft, 242 F.3d 477, 487 (3d Cir. 2001).  As the IJ did not rely upon "non-offer-based elements" in holding that the government satisfied its initial showing, we reserve that issue for a future decision.

presumption created by the government's initial presentation of firm resettlement and/or to accept the conclusion of firm resettlement but show he was within either of the two exceptions to the "firm resettlement" bar set forth in § 208.15.

The IJ considered Salazar's testimony that he paid an unidentified person to obtain the resident stamp on his behalf. Even accepting the testimony, Salazar produced no evidence that, beyond mere payment for the stamp, the stamp was not valid or that any irregularities would result in the eventual invalidation of the stamp by the Venezuelan government. Thus, there was insufficient evidence to persuade -- let alone compel -- the IJ to discount the facial validity of the resident stamp.

Similarly, the Salazars adduced <u>no</u> evidence of any "non-offer-based elements" which would <u>compel</u> a finding by the IJ that they had rebutted the government's <u>prima facie</u> showing. The evidence shows that Salazar lived in Venezuela for more than a year, obtained employment, and rented an apartment. Further, Ms. Salazar's Venezuelan citizenship suggests that Salazar established enduring familial ties in Venezuela, an inference that is further confirmed by the Salazars' two return trips to Venezuela. Given this record, it simply cannot be said that the IJ's decision that there was firm resettlement was unsupported by "substantial evidence."

Next is the question whether petitioner has shown he is within either of the two exceptions, parts (a) and (b) of § 208.15. See Mussie, 172 F.3d at 332. To fit within the second exception, an alien must show that the conditions of his residence in the third country "were so substantially and consciously restricted by the authority of [that] country" that he was not in fact resettled. 8 C.F.R. § 208.15(b). There is no basis for concluding -- and petitioner's counsel does not argue otherwise -- that Salazar fits within this exception.

This leaves only the exception in (a). To fit within the first exception, an alien must satisfy each of three prongs. The alien must show (1) that his entry into the third country was a "necessary consequence of his . . . flight from persecution," (2) that he remained there "only as long as was necessary to arrange onward travel, and" (3) that he "did not establish significant ties in that country." Id. § 208.15(a) (emphasis added). Salazar plainly failed to provide any evidence to meet the second prong, that he remained in Venezuela "only as long as was necessary to arrange onward travel." Under the regulation, § 208.15, it was Salazar's burden to establish this point. He did not. Salazar did say at the hearing that he stayed in Colombia for only two months and worked there in order to be able to continue with his trip. But he did not offer a similar explanation for the fourteen months he spent in Venezuela. As a result, the IJ's holding that Salazar

-13-

was firmly resettled in Venezuela, affirmed by the BIA, must stand. Since firm resettlement is a bar to asylum, we need not address whether Salazar met the burden to prove past persecution in Peru pursuant to § 208.13.

### III.

Although firm resettlement is, by regulation, a bar to the grant of asylum, we have found no statute or regulation that bars the relief of withholding of deportation on the basis of firm resettlement. While this omission may strike some as odd, the firm resettlement finding does have practical implications here. We consider the withholding of deportation claim independently, as have other circuits. See Cheo, 162 F.3d at 1229-30; Vang v. INS, 146 F.3d 1114, 1116-17 (9th Cir. 1997); Abdalla, 43 F.3d at 1399.

There are two salient distinctions between asylum and withholding of deportation. First, the alien must meet a higher standard to show withholding of deportation. He must show that, upon deportation, he is more likely than not to face persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. INS v. Stevic, 467 U.S. 407, 424 (1984). If a court upholds a denial of asylum, the application for withholding of removal necessarily fails. Second, even if the criteria for asylum are met, the decision as to relief is discretionary. But if the criteria for withholding of deportation are met, the grant of relief is mandatory. Aguirre-Aguirre, 526

-14-

U.S. at 419-20.  We engage in substantial evidence review for withholding of deportation, the same standard as for asylum.  We have not in this case addressed the propriety of the denial of asylum based on grounds other than firm resettlement and do not do so now.

Here, the IJ ordered deportation to Peru, but also permitted voluntary departure.  The finding of firm resettlement more than suggests that the Salazars may voluntarily depart to Venezuela, whose residence permit their passports bear.  Salazar has not shown that he cannot return to Venezuela, much less that he would more likely than not face persecution in Venezuela on one of the five grounds.  Nor has he shown that Venezuela would forceably repatriate him to Peru.  As such, the finding of firm resettlement provided sufficient evidence to support the denial of withholding of removal.

**IV.**

Petitioner argues that it was improper for the BIA to adopt the IJ's decision without rendering its own opinion.  The argument is frivolous.  It is well established that "if the Board's view is that the IJ 'got it right,' the law does not demand that the Board go through the idle motions of dressing the IJ's findings in its own prose."  Chen v. INS, 87 F.3d 5, 7-8 (1st Cir. 1996) (noting this court's agreement with eight other circuits that, "having given individualized consideration to a particular case,

-15-

[the BIA] may simply state that it affirms the IJ's decision for the reasons set forth in that decision").

## V.

The denial of petitioner's application for asylum and withholding of removal is **<u>affirmed</u>**. The order granting voluntary departure stands. So ordered.