# United States Court of Appeals
## For the First Circuit

No. 10-1037

ANTONIO ALVES VILELA,

Petitioner,

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Chief Judge,
Lipez and Howard, Circuit Judges.

Susan E. Zak was on brief for petitioner.
Sunah Lee, Trial Attorney, Office of Immigration Litigation, Tony West, Assistant Attorney General, Civil Division, and Michelle G. Latour, Assistant Director, were on brief for respondent.

September 9, 2010

**LYNCH**, **Chief Judge**.  Antonio Alves Vilela, of Brazil, entered the United States on January 26, 1997 on a six-month non-immigrant visa and overstayed.  He petitions for review of a December 7, 2009 final order of removal by the Board of Immigration Appeals (BIA).  The BIA, affirming the April 3, 2008 opinion of an Immigration Judge (IJ), denied Vilela's applications for asylum, withholding of removal, protection under the Convention Against Torture (CAT), and voluntary departure in the alternative.  Vilela petitions for review of only the BIA's denial of withholding of removal.  For that reason we omit mention of his asylum and CAT claims.  We deny the petition.

I.

Vilela was issued a Notice to Appear on September 30, 2004.  Conceding removability, Vilela applied for asylum, withholding of removal, and protection under the CAT, or voluntary departure in the alternative, before an IJ on February 7, 2006.  He appeared before an IJ for an evidentiary hearing on April 3, 2008.

We summarize Vilela's testimony before the IJ.  Beginning in the 1970s, Vilela engaged in what he called "social work" with other members of his church in impoverished parts of Belo Horizonte, a city in the Brazilian state of Minas Gerais.  The group provided food, toys, and medicine to the poor.  In 1985, Vilela and about twenty members of his church founded AMISE, an

acronym he explained stood for "Friends of the Neighborhood of Santa Efigenia and Sao Lucas," to formalize their work.

Vilela testified that AMISE grew to about one hundred members and became the most active community organization in the state. He said that his own connections to local politicians and his familiarity with government bureaucracy, gained from his former employment in local and state government, helped AMISE attract significant government support for its projects. Among AMISE's many accomplishments were upgrading roads, lighting, sewers, and utility lines, increasing the number of buses serving the neighborhoods, increasing policing, and providing training and craft fairs to combat unemployment.

Vilela claimed that as AMISE grew more successful, Communist activists began to see it as a drain on the political support they would otherwise receive from the neighborhoods. Vilela thought that AMISE's success cost the Communists electoral support. Vilela also testified that, as the leader of AMISE, he was a well-known figure in the community, and he appeared on local television and radio broadcasts speaking out against Communism.

Vilela testified that in 1990, he visited a neighborhood near Santa Efigenia to distribute informational flyers about AMISE. On a street called the Avenida Memdesa, a group of four people he knew to be Communists approached him, told him he could not distribute his flyers in that neighborhood, and said that he should

leave the region because their leader, Francisco Luciano, was angry at him for refusing to join the Communists' cause.

Vilela testified that within a month of the 1990 encounter, he began to receive phone calls from unidentified callers. Sometimes the callers would remain on the line in silence, sometimes they would laugh into the phone, and sometimes they would tell Vilela that he was "going to become a corpse." In the seven years between 1990 and his departure for the United States in 1997, Vilela said, he received more than 50 such phone calls. Vilela "only suspect[ed]" that the callers were Communists, because he was generally respected and well-liked in the community and so had no other enemies who could be making the calls. He never reported any of the calls to the police.

In 1992, an unknown vandal slashed all four of the tires on Vilela's car and scratched through the paint. Vilela did not report the vandalism to the police, and assumed that Communists were responsible, because he could not think of anyone else who would want to vandalize his car.

In 1996, an unknown vandal painted "death to Antonio" on the high fence surrounding Vilela's home. He did not report the vandalism to the police or photograph the damage; he simply repainted the fence.

Also in 1996, Vilela was walking to work down a straight section of the Avenida Memdesa when a car drove up onto the curb

-4-

and nearly hit him. Vilela thought the car looked like an unmarked police car; did not recognize either the driver or the passenger, who were laughing; but assumed they must be Communists. They did not make any further attempt to pursue him, and he did not know whether they were trying to kill him. He did not take down the car's license plate number or report the incident to the police.

On cross-examination, Vilela added that for a time after the car incident his wife thought there was someone following her wherever she went, but neither Vilela nor his wife reported this to the police.

As to why he did not report any of these incidents to the police, Vilela explained that retired police officers who were members of AMISE told him the police would do nothing in response and he thought the car looked like a police car.

Vilela testified that since his arrival in the United States, leftist politicians had come to power in Brazil, and political violence had broken out. Communists were suspected in the deaths of three people in the state of Rondônia, and these deaths, more than a thousand miles from Belo Horizonte, made Vilela feel like he would not be safe from the Communists anywhere in Brazil. He felt that he would be a "marked man" in Brazil because he had always been an outspoken anti-Communist in the church community and in the media.

Vilela was asked how he had obtained a United States Social Security card and work authorization card when he was, as he knew, ineligible for both. Vilela maintained that he was a "victim" of a scam in which he paid $2500 in "legal fees" to obtain a "legitimate card." In 2004, Immigrations and Customs Enforcement (ICE) discovered the scam--an attempt by a Social Security Administration employee to sell actual Social Security cards to illegal immigrants--and interviewed Vilela as a client of the scheme. Vilela testified that he still had the fake Social Security card, and claimed it was only during cross-examination that he was first made aware that the card was invalid. He also claimed not to know what a work authorization card was, but eventually said that he had received one from a former employer who told him it was legitimate.

The IJ denied Vilela relief. The IJ noted that Vilela's testimony was plausible and internally consistent, but highlighted her concern that he had "embellish[ed]" his story. She found Vilela undermined his own credibility by using fraudulent documents and by either battering his wife or accepting her filing of a fraudulent police report.[1] As a result, the IJ held that she would

---

[1] On cross-examination, Vilela testified that a restraining order his wife had taken out against him in the United States in June 2007 was based on a knowingly false report of domestic violence. He claimed she filed it as part of her plan to obtain legal status in the United States as a victim of domestic abuse. Vilela stated that his wife later told him that the restraining order was a mistake, and that she apologized to him.

deny withholding of removal and voluntary departure as a matter of discretion, even if Vilela had established eligibility for relief, which he had not.

The IJ found that Vilela had not established eligibility for withholding of removal, because he had not shown past persecution or a well-founded fear of future persecution. Further, he had been unable to identify any of his antagonists, to establish a nexus between any of the harms he suffered and a protected ground, or to establish that those harms, including the phone threats, amounted to more than harassment. The IJ concluded that in a poor neighborhood like Vilela's, it was plausible that the property vandalism and car incident Vilela described were isolated and unrelated incidents.

The IJ also found that Vilela had not established government involvement or acquiescence. The IJ found that he could relocate safely within Brazil.

The BIA dismissed the appeal, upholding the IJ. The BIA treated Vilela's testimony as presumptively true. Even so, the BIA affirmed the IJ's findings that Vilela had failed to show harm rising to the level of persecution, nexus sufficient to support a

---

Vilela also testified that an assault and battery charge against him in October 2007 was based on his wife's mistaken impression that he was going to attack his daughter, who he was confronting about conduct reports from school. Vilela claimed that he, his wife, and his daughter had all gone before the judge in the case to state that he had not struck his daughter. The charge was dismissed for failure to prosecute in March 2008.

finding of past persecution or a well-founded fear of future persecution, country-wide future danger, or eligibility under CAT.

## II.

Where, as here, the BIA has issued its own opinion, we review the BIA's opinion, as well as any portion of the IJ's opinion adopted by the BIA.[2] Bonilla v. Mukasey, 539 F.3d 72, 76 (1st Cir. 2008). We review the BIA's determinations according to the deferential substantial evidence standard, upholding them unless "any reasonable adjudicator would be compelled to conclude to the contrary." Budiono v. Mukasey, 548 F.3d 44, 48 (1st Cir. 2008) (quoting 8 U.S.C. § 1252(b)(4)(B)). Vilela does not raise any pure questions of law.

Only Vilela's withholding of removal claim is before us.[3]

Withholding of removal protects an alien from removal to a country where "the alien's life or freedom would be threatened in

---

[2] The BIA did not adopt the IJ's alternative holding, that she would deny Vilela withholding of removal as a matter of discretion. "When the BIA does not consider an IJ's alternative ground for denying relief, that ground is not before us." Bonilla v. Mukasey, 539 F.3d 72, 81-82 (1st Cir. 2008). This case does not implicate the provision of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) that denies judicial review of decisions committed to the Attorney General's discretion by statute. See id.; 8 U.S.C. § 1252(a)(2)(B)(ii); cf. Kucana v. Holder, 130 S. Ct. 827 (2010) (interpreting IIRIRA jurisdiction-stripping provision).

[3] Vilela did not challenge the IJ's findings denying his claims for asylum, protection under the CAT, and voluntary departure before the BIA, and he does not attempt to challenge them here.

-8-

that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). Vilela bears the burden of demonstrating that it is "more likely than not" that he will be persecuted on account of a protected ground if he returns to Brazil. See Makalo v. Holder, No. 09-2034, 2010 WL 2802642, at *2 (1st Cir. Jul. 19, 2010). A showing of past persecution creates a rebuttable presumption that future persecution is likely. Pulisir v. Mukasey, 524 F.3d 302, 308 (1st Cir. 2008). Because Vilela has not argued in this court that he has established likely future persecution, he has waived that argument and his withholding of removal claim is based solely on the presumption of future persecution that would attach if he prevailed on his claim of past persecution. See Diaz-Garcia v. Holder, 609 F.3d 21, 30 n.8 (1st Cir. 2010).

We rest on the BIA's and IJ's rulings. Substantial evidence supported their conclusions that Vilela failed to establish a nexus between the harm he had suffered and any protected ground, and failed to establish that what he suffered rose to the level of persecution.

Vilela insists that the harms he suffered were inflicted on account of his anti-Communist political views.[4] But he failed to produce convincing evidence of a causal connection between the

---

[4] While Vilela originally claimed to have been persecuted on grounds of both political opinion and membership in a social group--AMISE--he abandoned his social group claim before the BIA.

harm he suffered and his political views. See Sugiarto v. Holder, 586 F.3d 90, 95 (1st Cir. 2009). Vilela did not identify the perpetrators in any of the incidents he described in his testimony, except to state that he knew the four people who approached him in Paradaiso, in 1990 when he was distributing flyers, to be Communists. There was no evidence connecting this incident to any of the other incidents he described. Vilela suspected that the perpetrators of the other events he described were Communists because he assumed that he had angered the Communists, and because he could not think of any other personal "enemies."

The IJ and BIA were free to reject Vilela's speculation that Communists were behind every event because he assumed that he had angered the Communists, and because he could not think of any other personal "enemies." Ziu v. Gonzales, 412 F.3d 202, 204 (1st Cir. 2005). It is a rare self-proclaimed public leader or social activist who garners no enemies. Nor did Vilela show that the events were motivated by his political views. "While the petitioner was not required to identify [his] antagonists with absolute certainty, [he] was required . . . to furnish some credible evidence of the motivation underlying" their treatment of him. Lopez de Hincapie v. Gonzales, 494 F.3d 213, 219 (1st Cir. 2007); see also Sugiarto, 586 F.3d at 95.

Vilela also insists that the phone threats he described constituted persecution, particularly when combined with the

-10-

vandalism and the incident in which he was nearly struck by a car. The BIA was not compelled to find these events to be persecution. "[U]npleasantness, harassment, and even basic suffering" do not rise to the level of persecution. Sihombing v. Holder, 581 F.3d 43, 45 (1st Cir. 2009) (quoting Jorgji v. Mukasey, 514 F.3d 53, 57 (1st Cir. 2008)) (internal quotation mark omitted). And while "credible verbal death threats may fall within the meaning of 'persecution,'" Un v. Gonzales, 415 F.3d 205, 210 (1st Cir. 2005), this is only when the threats are "so menacing as to cause significant actual suffering or harm." Bonilla, 539 F.3d at 77 (quoting Tobon-Marin v. Mukasey, 512 F.3d 28, 32 (1st Cir. 2008)) (internal quotation marks omitted).

The IJ found the threats the "most troubling" aspect of Vilela's case, but still found them to constitute harassment rather than persecution. The IJ found the threats not credible as death threats because it appeared that Vilela was "never in serious danger." The threats were not "sufficiently credible or imminent to rise to the level of persecution." Ravix v. Mukasey, 552 F.3d 42, 46 (1st Cir. 2009). Vilela was only even arguably in danger of physical harm when he was nearly struck by a car. And there is no evidence connecting his nearly being struck by a car with the threats.

The petition is denied. So ordered.